IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ISAIAS R. ORTIZ  
      Petitioner

    v.

THOMAS CARROLL, WARDEN  
      Respondant

)  
)  
)   C.V. No.   0 7 -  4 2 1  
)  
)

MEMORANDUM OF LAW IN SUPPORT OF

PETITION FOR WRIT OF HABEAS CORPUS

PETITIONER'S OPENING BRIEF

0 7 -  4 2 1



FILED

JUL - 3 2007

6 - 26 - 07  
DATE

*Isaias R. Ortiz*  
Isaias R. Ortiz, #00480744  
Del. Corr. Cntr.  
1181 Paddock Rd.  
Smyrna, DE 19977-9679

## ARGUMENTS IN SUPPORT OF
## WRIT OF HABEAS CORPUS

On October 18, 2002, defendant Isaias R. Ortiz was unlawfully detained after a traffic stop in which the officer who made the stop illegally seized a jacket or sweater from Ortiz's vehicle without defendant's consent, probable cause, or a court warrant, thus violating defendant's Constitutional Fourth Amendment Right with an unlawful and unreasonable search and seizure.

The question arises as to whether the officer who made the stop had probable cause to stop and/or search the defendant's vehicle. It is understood that the officer was allegedly reacting on inconclusive information received from an alleged informant, information that was questionable at best, and the officer's actions following the stop of defendant Ortiz was not in accordance to police procedure or constitutional requirements. A stop must be justified at its inception by reasonable suspicion of criminal activity. Terry v. Ohio, 392 U.S. 1 (1968). When defendant Ortiz and his companion left the residence of 1908 Lancaster Avenue, the alleged informant, based upon police testimony was present to witness Ortiz and his female companion exit the Lancaster residence which was a multiple residential building (at least two apartments existed in the building), and yet the supposed informant never once gave any kind of a positive identification of defendant as a suspect or a person of interest, by description, in any illegal activity at this residence, nor did the police (according to documented record), ask the alleged informant to give positive identification of the defendant or

1

to confirm Ortiz as a suspect of interest to implicate defendant in any illegal activity. Therefore, without any true means to tie defendant Ortiz to any illegal activity at any of the residences of 1908 Lancaster Avenue, there is serious question as to whether the stop of Ortiz, questioning and the search of defendant's vehicle was supported by reasonable and articulate suspicion. Robertson v. State, 596 A.2d 1345 (Del. Supr. 1991).

As described in Caldwell v. State, 780 A.2d 1037 (Del. Supr. 2001); after an officer effectuates a lawful investigative stop supported by reasonable suspicion, the officer has an absolute right to conduct a limited search of the suspect for any weapons if the officer has a reasonable belief that the suspect is presently armed and dangerous. However, the facts of defendant Ortiz's case do not support a finding under Caldwell, Whereas the officer had no true understanding of Ortiz's involvement if any, in any unlawful activity, and furthermore had no information or confirmed suspicions to conclude that defendant Ortiz was armed or dangerous.

As previously described, defendant Ortiz was stopped by Detective Rodriquez without probable cause or a search warrant, and after causing Ortiz and his companion to exit his vehicle and learning that the defendant had no proof of identification on his person, detective Rodriquez took it upon himself without consent from defendant Ortiz to reach into defendant's vehicle to remove a jacket or sweater that was in the rear seat of the defendant's vehicle. The United States Constitutional Fourth Amendment states that the people have the right to be secure against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue upon probable cause,

2

supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. This right of defendant Ortiz's was violated as is evident by the facts of this case and shows that Ortiz's conviction was in fact tainted by violations of his constitutional rights which gives cause to invoke the protection of the Superior Court Rule 61. Jones v. Anderson, 54 Del. 587, 183 A.2d 177 (1962).

Consequently, the unwarranted and illegal search of defendant Ortiz's vehicle lead to the arrest of Ortiz and his companion as a substance described as crack cocaine was found in the jacket or sweater which was unlawfully seized from the vehicle, and the finding of a set of keys subsequently led officers to the residence of 1933 West Fourth Street where additional drugs were found and seized. The lack of information to properly identify Ortiz as a person of interest in any unlawful activity at the 1908 Lancaster Avenue residence suggests that the police, without the illegal search of defendant's vehicle and the unlawful seizing of the jacket or sweater from the vehicle where a set of keys to another residence were seized, would not have been able to secure a warrant for the search of the 1933 West Fourth Street residence.

Probable cause permits the warrantless search and seizure of a vehicle and its occupants and exists if the facts known before the search and seizure would justify the issuance of a search warrant. This was not so in Ortiz's case. Harris v. State, 806 A.2d 119 (Del. Supr. 2002); Maryland v. Dyson, 527 U.S. 465 (1999).

3

The subsequent search of the residence at 1933 West Fourth Street was a result of the unlawful search and seizure of the jacket/sweater found in defendant Ortiz's vehicle before Ortiz was ever put into custody because immediately following the stop the officer had no probable cause to arrest Ortiz. Therefore, all evidence obtained as a result of the unlawful search and seizure must be suppressed because of violations to defendant's rights. Terry v Ohio, 392 U.S. 1 (1968). Const. Amend. 4, 11Del. C. § 1902, §1903.

The United States Constitutional Fifth Amendment states that: No person ....... shall be compelled in any criminal case to be a witness against himself. Thus the trial judge, Charles H. Toliver abused his discretion in denying a continuance request by defendant to allow an interpreter to be present during trial on behalf of defendant Ortiz so that the defendant could fully understand what legal actions were being taken against him and to give him an opportunity to properly and adequately respond via an interpreter if necessary.

On the day of his trial, September 30, 2003, defendant Ortiz, who is a National of the Dominican Republic indicated to the court that he wished to have his case continued so that he could secure a 'Spanish Interpreter', (Appendix A; Pg.5).

Ortiz's argument was that although he could speak and understand some or little of the English language, his comprehension of the legal jargon and the terminology's used in the court of law were too much for him to know what

4

was really being said during his trial hearing. A criminal defendant who is unable to understand the English language is effectively denied the right to consult with an attorney, to confront his/her accusers and/or waive constitutional rights knowingly, intelligently, and voluntarily. United States v Cirrincione, 780 F.2d

620 (7th Cir. 1988). Id at 634; the Court held that a defendant is denied Due Process when:

> 1. What is told him is incomprehensible.
>
> 2. The accuracy and scope of the translation at a hearing or trial is subject to grave doubt.
>
> 3. The nature of the proceedings is not explained to him in a manner designed to insure his full comprehension.
>
> 4. A credible claim of incapacity to understand due to language difficulty is made and the Court fails to review the evidence and make appropriate findings of facts.

Prior to or during the trial hearing, defendant Ortiz's counsel informed the court of Ortiz's request for a translator as is documented in the trial transcript on page 5 of Appendix A attached. But instead of the trial judge granting Ortiz's request for an interpreter, the trial judge proceeded to question Ortiz to the point of intimidation (Appendix A; Pg. 7-52), and then the trial judge makes a decision at defendant Ortiz's expense.

It is clearly evident by the defendant's responses to the judge's questioning that total comprehension was absent on the part of defendant Ortiz. The

5

attorney for Ortiz, Anthony Figliola also made a statement during the trial hearing (Appendix A; Pg. 26, Ln. 15-17) which leaves to question the issue of his clients state of comprehension of the English language and more so Ortiz's understanding of the legal terms used by the court. Ortiz also stated that most of his letters and correspondence to his attorney were assisted by someone else who could better articulate what he was meaning to say to his counsel because he could not do so on his own. By necessary implication, before reaching a final decision as to sentencing, the sentencing judge must have an open mind at least to the extent of receiving all information bearing on the question of mitigation.

Siple v State, Del. Supr., 701 A.2d 79 (1997). Del. Supr. Rule 32.


It is clear that Ortiz lacked critical understanding of most of the questions from judge Toliver by his responses. And the United States Constitutional Fifth Amendment is supposed to protect a person from being 'compelled in any criminal case to be a witness against himself'. It was an abuse of discretion to deny defendant Ortiz his request for a continuance to secure an interpreter and a direct violation of Ortiz's right of the 'Equal Protection of the Laws'. U.S. Const. Amend. 5, 14.


As for the timetable to which defendant Ortiz is now submitting his petition for Writ of Habeas Corpus, the one year following sentencing which was on December 19, 2003 should be tolled being as Ortiz did the following:

> 1.) Appealed his conviction on August 31, 2004.
> (Denied – November 16, 2004).

6

       2.) Filed motion for Post Conviction Relief on August 22, 2006
           for constitutional violations.
           (Denied – September 15, 2006).


After exhausting all State remedies, defendant Ortiz now seeks relief from

this Honorable United States District Court of Delaware.

# OF

# TRIAL HEARING

# SEPTEMBER 30, 2003

# APPENDIX A

IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,

    V        ID. No. 0210012072

ISAIAS RIVERA ORTIZ, and
NEMENSIO RIVERA,      ID No. 0210012080

    Defendants.

Tuesday, September 30, 2003

BEFORE:  HON. CHARLES H. TOLIVER, IV, J
      AND A JURY

APPEARANCES:

   DEPARTMENT OF JUSTICE
   BY: CYNTHIA KELSEY, ESQ., AND
     RENEE HRIVNAK
   On behalf of the State

   ANTHONY A. FIGLIOLA, ESQ.
   On behalf of the Defendant Ortiz

   CHRISTOPHER TEASE, ESQ.
   On behalf of the Defendant Rivera

ALSO PRESENT: Grettel Huber, Interpreter

- - - - -

Trial

- - - - -

SUPERIOR COURT REPORTERS
500 N. King Street, Suite 2609
Wilmington, Delaware 19801-3725
(302) 255-0562

LYNNE BELL COALE, Registered Merit Reporter
Official Court Reporter

COPY

IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,

      v.          ID. No. 0210012072

ISAIAS RIVERA ORTIZ, and
NEMENSIO RIVERA,       ID No. 0210012080

    Defendants.

Tuesday, September 30, 2003

BEFORE:   HON. CHARLES H. TOLIVER, IV, J
         AND A JURY

APPEARANCES:

    DEPARTMENT OF JUSTICE
    BY: CYNTHIA KELSEY, ESQ., AND
       RENEE HRIVNAK
    On behalf of the State

    ANTHONY A. FIGLIOLA, ESQ.
    On behalf of the Defendant Ortiz

    CHRISTOPHER TEASE, ESQ.
    On behalf of the Defendant Rivera

ALSO PRESENT:  Grettel Huber, Interpreter

-----

Trial

-----

SUPERIOR COURT REPORTERS
500 N. King Street, Suite 2609
Wilmington, Delaware 19801-3725
(302) 255-0562

**Page 2**

1

2          INDEX
    SOLMARI TORRES AYALA
3    Examination    - The Court    15

4    Direct Examination - Ms. Kelsey  119
    Cross-Examination - Mr. Figliola  149
5    Cross-Examination - Mr. Tease    159
    Redirect Examination - Ms. Kelsey  164
6    Recross-Examination - Mr. Figliola  173

7    Recross-Examination - Mr. Tease  175

8

9

10       EXHIBITS

11 (NONE MARKED)

12    - - -

13

14

15

16

17

18

19

20

21

22

23

**Page 3**

1   (Courtroom 4C)

2     - - -

3     THE COURT: Sorry about the delay. Your

4 client is not amenable to resolving this matter,

5 otherwise?

6     MR. TEASE: Your Honor, I don't know if

7 I've gotten a formal plea offer. I think it might be

8 trafficking, where he would be looking at 20 years as

9 a fourth-time felony offender. But I haven't

10 formally gotten a plea offer, and I would doubt the

11 client would take that, anyway.

12     THE COURT: We'll go through the colloquy

13 with each, make sure they understand.

14     Is the State offering 18 or 20?

15     MS. KELSEY: I had offered trafficking

16 five to 50, and conspiracy second.

17     MR. TEASE: That would be what, 28 years?

18     MS. KELSEY: Well, it's three years

19 min/man.

20     MR. TEASE: But, then, habitual offender

21 status.

22     MS. KELSEY: Well, it's a drug offense,

23 so the maximum isn't the minimum.

**Page 4**

1     MR. TEASE: So, it would be three to

2 life?

3     MS. KELSEY: Yeah, three to life. And

4 the conspiracy second is a Title -- well, maximum of

5 two, anyway, but it's not a violent felony.

6     MR. TEASE: Your Honor, I'm sorry about

7 that.

8     THE COURT: In terms of what?

9     MR. TEASE: Of not knowing that the drug

10 offense apparently carries a three under the

11 habitual -- minimum of three.

12     THE COURT: I was getting destroyed. I

13 mean, well, I was -- we didn't know but, we know now.

14 But anyway, if that's the deal, that will only take a

15 couple seconds to tell him that, that he -- it

16 depends. Mr. Figliola's client was offered eight.

17 And yours is a discretionary sentence.

18     (Kelsey and Tease conferring.)

19     MS. KELSEY: Yeah, a Title 11 violent

20 felony. Here it is.

21     THE COURT: Miss Kelsey, are they both

22 going to sit with you.

23     MS. KELSEY: No, just Miss Hrivnak.

Page 5

1    MR. TEASE: I think it might be helpful
2  if myself and Miss Huber go back and talk to Mr.
3  Rivera for a few minutes before we come in.
4        THE COURT: Mr. Figliola, I can go
5  through the colloquy with your client and shorten
6  that part of the process.
7        MR. FIGLIOLA: Sure. Let me explain it
8  to him.
9        (Mr. Figliola and client conferring.)
10       MR. FIGLIOLA: Thank you, your Honor.
11 We're prepared to go forward on that. Go to the
12 podium.
13       Now you need a translator?
14       (Your Honor, he just informed me he needs
15 a translator.)
16       THE COURT: Have you had any problem
17 communicating any concepts or any language difficulty
18 with this defendant?
19       MR. FIGLIOLA: No, your Honor. And we
20 had a -- we went through a preliminary hearing and a
21 suppression hearing, both without an interpreter.
22       THE COURT: And how long have you been
23 assigned to this case?

Page 6

1        MR. FIGLIOLA: Preliminary hearing was
2  last October.
3        THE COURT: Of 2002?
4        MR. FIGLIOLA: Yes.
5        THE COURT: And have you been to see --
6  what's this defendant's name?
7        MR. FIGLIOLA: Mr. Ortiz, your Honor. I
8  spoke with Mr. Ortiz probably on at least four
9  occasions. And he's written me letters, and I've
10 written him letters in English, yes, your Honor.
11       THE COURT: His letters to you were in
12 English and your letters to him were in English?
13       MR. FIGLIOLA: Yes, your Honor.
14       THE COURT: Mr. Ortiz, for the record,
15 you wish to state your full name and address?
16       MR. ORTIZ: M -- yeah, I can understand
17 but I cannot speak too much.
18       THE COURT: Mr. Ortiz, I've been on the
19 bench 13 and a half years.
20       MR. ORTIZ: Mm-hmm.
21       THE COURT: And this is a significant
22 trial. And if an attorney who's a member of the bar
23 who I've been professionally acquainted with for that

Page 7

1  entire period of time is telling me that you've
2  written him letters in English, you've communicated
3  with him in English, now approximately one year
4  later, 10 months since -- well, a year later since he
5  was appointed to represent you, for the first time,
6  you state you need an interpreter.
7        Now, you want to explain to me -- I ask
8  him to submit Court exhibits, copies of
9  correspondence he's received from you. I'm about to
10 call as witnesses Corrections officers who have
11 monitored your stay or custody at Gander Hill and
12 wherever else you've been, and, then, we're going to
13 proceed from there. Now -- plus I will also call on
14 inmates just to let you know. (INTIMIDATION)
15       MR. ORTIZ: Yeah, I wrote that letter to
16 him, but somebody wrote the letter for me.
17       THE COURT: That's all right. We have
18 handwriting analysis, and I'll also submit it to
19 somebody for that. You tell me who the inmate is and
20 I'll ask that inmate did he, in fact, write it for
21 you.
22       THE DEFENDANT: He went home already.
23       THE COURT: Well, if you tell me his

Page 8

1  name, I'll find him. I have excellent resources in
2  the community, excellent.
3        MR. ORTIZ: Brown something, Brown.
4        THE COURT: I'm sorry?
5        THE DEFENDANT: He name is Brown.
6        THE COURT: Okay. Do you remember a
7  first name?
8        THE DEFENDANT: No, he was my cellie, you
9  know.
10       THE COURT: So, we can check the
11 assignments to your cell, because they have records
12 of that.
13       MR. ORTIZ: Yes, your Honor.
14       THE COURT: What pod are you on?
15       MR. ORTIZ: Say what?
16       THE COURT: What pod are you on?
17       MR. ORTIZ: Okay. 2G.
18       THE COURT: 2G? How long have you been
19 on 2G?
20       MR. ORTIZ: Like, almost a year.
21       THE COURT: Then, I'll find out who --
22 bring the officer over, any officer who's been on 2G,
23 and we'll find out if you have any difficulty

A18

Page 9

1  speaking English.
2      Now, who was the preliminary hearing in
3  front of, Mr. Figliola? Do you remember?
4      MR. FIGLIOLA: I'll look at my notes,
5  your Honor. I can't recall, the preliminary hearing,
6  which judge it was, your Honor.
7      THE COURT: Let me ask you this.
8      MR. FIGLIOLA: It was -- I can give you
9  the date of the preliminary hearing. I don't have
10 the date written down in my -- he was arrested on
11 October 18, 2002, so it would have been probably a
12 week later. The suppression hearing -- oh, I'm
13 sorry, here it is. I do have the date. I do had interprete
                                         ∧ that
14 October 31, 2002, was the preliminary  day
15 hearing. And the suppression hearing was in front of
16 Judge DelPesco, and I don't have the exact date on my
17 notes. Sorry, I do. February 28, 2003.
18      - THE COURT: Okay. Now, for the record,
19 Mr. Ortiz, state your full name and address.  ⌐
20      (MR. ORTIZ: Okay. 703 North Monroe.)
21      THE COURT: North Monroe. And how long
22 did you live there?
23      MR. ORTIZ: It's, like, almost two years.

Page 10

1      THE COURT: Okay. And did you live there
2  alone?
3      MR. ORTIZ: Almost.
4      THE COURT: Did you live there alone.
5      MR. ORTIZ: No, with my wife.
6      THE COURT: And what's your wife's name?
7  Is that the 16-year-old?
8      Send her to bring that young girl in
9  here, please.
10     MS. KELSEY: Your Honor, I took her down
11 to the witness room.
12     THE COURT: Send for her. We'll bring
13 her up, too. We want to establish whether he can or
14 cannot speak English.
15     MS. KELSEY: Your Honor, if you're going
16 to ask questions of the defendant, I wanted to ask
17 that you swear the defendant so that --
18     THE COURT: It's not going to matter,
19 Miss Kelsey.
20     MS. KELSEY: It might be the basis of
21 new --
22     THE COURT: Perjury is the least of his
23 problems.

Page 11

1      MS. KELSEY: May I use the Court's phone
2  to call.
3      THE COURT: Sure. And she had another
4  lady with her. Was it her mother?
5      MS. KELSEY: Yes, your Honor.
6      THE COURT: Well, bring her up, too.
7      See, I'm kind of funny, Mr. Ortiz, about
8  people who are not candid with me. And let me
9  explain to you something about how, I'm kind of funny
10 about certain things, and I expect people to be at
11 least up front with me. And there is a provision of
12 Delaware law known as 11 Delaware Code Section 1271,
13 which deals with contempts, when people are
14 disruptive or intend to interfere with the orderly
15 processes of the Court. That doesn't mean simply if
16 you jump up and down and throw things and disrupt it.
17 If you attempt to intentionally interfere, then I am
18 entitled to summarily impose up to six months
19 punishment.
20     The interesting twist on that, under, I
21 think it's 3201 of 11 Delaware Code, which I'll find
22 for you, it deals with conditions of confinement.
23 And it also allows the Court to impose, I think it's

Page 12

1  up to three months of solitary confinement. The
2  interesting provision of doing that -- it's not meant
3  to prohibit anyone from exercising their rights, but
4  sometimes people don't understand, when they say or
5  do things and they don't take matters seriously, that
6  there are serious consequences which are immediate
7  and don't depend upon the resolution of the trial.
8      Now, I'm going to ask you person to
9  person now. Are you honestly telling me that, after
10 a preliminary hearing, after being arrested, being in
11 prison and talking with your attorney and never
12 having asked for a translator, that you now have some
13 difficulty understanding English? Before I call
14 these officers in, before I bring this lady up here,
15 the young lady and her mother, and ask them
16 questions, now, I'm going to ask you straight up, is
17 that what you're telling me? Because it doesn't seem
18 that that has been the case.
19     Now, I'm also going to bring in a couple
20 Corrections' officers just to complete the record.
21 And I'm not going to hold up trial. I'll do that at
22 lunchtime. So, we want to go forward, unless I feel
23 that there is an issue that we need to discuss.

A19

Page 13

1     Now, Mr. Figliola has already said he
2 hasn't had any problem talking to you, and this is
3 the first time in a year he's heard this. So, you
4 want to tell me now or rethink your position? You
5 don't have to. I just want to make sure, before I go
6 to this effort, that we don't have any
7 misunderstanding, because I may have misunderstood.
8     ( MR. ORTIZ: Yeah, I tell you, I can
9 understand, but I cannot speak too much. )
10     THE COURT: Well, since there hasn't been
11 an issue of you taking the stand, we don't have any
12 problem at this point. But I'll tell you, you have a
13 seat, we're going to conduct a little colloquy there.
14     What's the mother's name?
15     MS. KELSEY: I gave the clerk my --
16     THE COURT: Ma'am, your name, please?
17     MS. KELSEY: Ayala, Maria.
18     MRS. AYALA: My name?
19     THE COURT: Do you have any problem
20 understanding or speaking English?
21     MRS. AYALA: Mother no.
22     THE COURT: Could you come up and take
23 the stand, please?

Page 14

1     Swear the witness. State your name,
2 please.
3     MRS. AYALA: Maristella Ayala. I say I
4 no speak English.
5     THE COURT: We'll find out. You don't
6 understand your name, ma'am?
7     MRS. AYALA: Name?
8     THE COURT: I asked you who you were and
9 you told me.
10     MRS. AYALA: I say my name.
11     THE COURT: Do you speak English?
12     MRS. AYALA: No.
13     THE COURT: What do you do for a living?
14     THE CLERK: Work?
15     MRS. AYALA: No.
16     THE COURT: Do you speak English, ma'am?
17     MRS. AYALA: Yes.
18     THE COURT: You can step down. I'll talk
19 to her.
20     SOLMORI TORRES AYALA,
21 called as a witness, being duly sworn, was examined
22 and testified as follows:
23     EXAMINATION

Page 15

1 BY THE COURT:
2   Q  What is your name, name?
3   A  Solmori.
4   Q  Ma'am, I'm Judge Toliver. I'm the
5 individual who's going to be presiding over this
6 case. And a question has come up, and I want to make
7 sure we take the necessary precautions.
8     Where were you born?
9   A  Puerto Rico.
10   Q  And how long have you been in this state?
11   A  Eleven years.
12   Q  And how old are you?
13   A  Seventeen.
14   Q  And your date of birth?
15   A  10/18/86.
16   Q  Have you had any difficulty reading or
17 writing English?
18   A  No.
19   Q  Do you have any difficulty speaking
20 English?
21   A  No.
22   Q  How long have you known the defendant,
23 Mr. Ortiz?

Page 16

1   A  A year now.
2   Q  A year? Did you and he have some sort of .
3 relationship?
4   A  What you mean?
5   Q  Do you have some sort of -- do you have
6 any sort of relationship? How do you know him?
7     You don't know how you know him? Is he
8 your boyfriend, or was he your boyfriend?
9   A  Before I got locked up, I know him for
10 three months.
11   Q  Before you got locked up, you knew him
12 for what?
13   A  I knew him for about a month.
14   Q  When I say how did you know him, were you
15 friends, enemies? Husband and wife?
16   A  Just -- he was not my boyfriend. I don't
17 know.
18   Q  Do you have a child? Is the child in any
19 way related to him?
20   A  Yes.
21   Q  How is the child related to him?
22   A  That's his father.
23   Q  So, you and he have a child together?

## Page 17

```
 1   A   Mm-hmm.
 2   Q   You have to say "Yes" or "no," ma'am.
 3   A   Yes.
 4   Q   So there was some sort of romantic
 5  relationship between the two of you; right?
 6   A   Yes.
 7   Q   And that was how long before you had the
 8  child?
 9   A   A month.
10   Q   Okay.  And have you -- and that was --
11  so, the child is how old?
12   A   He's going to be four months.
13   Q   Okay.  So, that meant, this being
14  September, he was born in, like, June?
15   A   Yes.
16   Q   So that meant he was conceived sometime
17  in September.
18   A   Yes.
19   Q   Okay.  Now, in the year or so you've
20  known the defendant, have you communicated with him
21  while he's been incarcerated?
22   A   No, this is the first time he seen his
23  son.
```

## Page 18

```
 1   Q   Have you written him, talked to him,
 2  spoke with him?
 3   A   No.
 4   Q   You've had no contact with him until
 5  today?
 6   A   When I go to Court, I see him.
 7   Q   Okay.  Did you ever talk to him while you
 8  were in Court?
 9   A   No.
10   Q   How did you know to come here today?
11  You're a State's witness?
12   A   They send me letter.
13   Q   So, from the time you got arrested
14  sometime in October until now, you've had no written
15  or oral conversation with the defendant?
16   A   No.
17   Q   In the month or so you knew him, did you
18  have any problem talking to him?  In English, I
19  meant.
20   A   What you mean?
21   Q   Did you speak to him in English, talk to
22  him in English?
23   A   In Spanish.
```

## Page 19

```
 1   Q   So, you never talked to him at all in --
 2  ma'am, you're under oath.  I want you to understand,
 3  you're under oath, and I take that very, very
 4  seriously.  And if I find out otherwise --
 5   A   He can speak a little bit of English, but
 6  he knows more Spanish.
 7   Q   That's not what I asked you, and I want
 8  you to be real careful because you're under oath.
 9  And I want you to look at me and I want you to see
10  how serious I am about this.
11   A   Yes.
12   Q   So, it's not a game and I'm not playing.
13  I'm going to ask you this one more time, and I want a
14  clear answer, and I want you to think about me as the
15  judge in this Court who's asking you a question under
16  oath.  So, under penalty of perjury, among other
17  things -- now, do you understand what perjury is?
18   A   No.
19   Q   I'm sorry?
20   A   No.
21   Q   If you do not tell the truth and you're
22  later -- under oath, there are criminal penalties
23  attended to not telling the truth when you're called
```

## Page 20

```
 1  as a witness and sworn.  Do you understand that?
 2   A   Yes.
 3   Q   And those penalties include the
 4  possibility of jail and fines.  You understand that?
 5   A   Yes.
 6   Q   And I'm going to ask you again, did you
 7  converse or were you able to speak to the defendant,
 8  Mr. Ortiz, in English as well as Spanish?
 9   A   Not as well as Spanish.
10   Q   Did you speak to him in English, ma'am?
11   A   Sometimes.
12   Q   I'm sorry?
13   A   Sometimes.
14   Q   Did he seem to have any difficulty
15  understanding what you said to him?
16   A   Sometimes he won't understand something.
17   Q   Ma'am, I'm serious.  I'm real serious.
18  That's your testimony.
19       So, if I can find some other witness who
20  heard you speak to him in English and him responding
21  in English, that person would not be telling the
22  truth?
23   A   No.
```

Page 21

1  Q  So, you never -- he didn't understand you
2  in English?
3  A  I would talk to him in English, but he
4  was better off talking to him in Spanish.
5  Q  But he understood English as well, or did
6  he understand English?
7  A  I don't know what he understand.
8  Q  Did he have a job?
9  A  I don't know. I only knew him --
10  Q  I'm sorry.
11  A  I only knew him for that month. He had a
12  wife.
13  Q  Where did you see him?
14  A  I met him at the Spanish festival last
15  year.
16      MS. KELSEY: Judge, she was living with
17  him at the time.
18  BY THE COURT:
19  Q  Did you two ever occupy a household
20  together?
21  A  No.
22  Q  I'm sorry?
23  A  No. He had his girl, living with his

Page 22

1  girl. I was living with --
2  Q  You never occupied the same household
3  with him?
4  A  No.
5  Q  You never spent nights -- what's the
6  residence?
7      MS. KELSEY: 1913 West Fourth Street,
8  Apartment B.
9  BY THE COURT:
10  Q  You never spent nights in an apartment at
11  1914 West Fourth Street?
12  A  I would chill with him, I spent some time
13  with him. But for sleep, I would go back to my
14  mother's.
15  Q  You say you would chill with him?
16  A  Like, be with him.
17  Q  And your testimony, you didn't live
18  there, you didn't have clothing there, and you didn't
19  sleep there?
20  A  No.
21  Q  I just want to make sure before we bring
22  in these other witnesses.
23      And what is your date of birth?

Page 23

1  A  10/18/86.
2  Q  And this was in September?
3  A  Mm-hmm.
4  Q  When you were 15?
5  A  Mm-hmm.
6      THE COURT: Maybe you didn't explain that
7  to your client, Mr. Figliola.
8      All right, ma'am, that's enough. I've
9  heard all I need to hear. I think two weeks short of
10  her 15th birthday, 16th birthday, which constitutes
11  an interesting set of events.
12      Sir, you are? Corporal African American?
13      DEPT. OF CORRECTION: Corporal Boyce.
14      THE COURT: I don't mean any harm, but I
15  don't think you're African American. You could be, I
16  don't know.
17      DEPT. OF CORRECTION: I couldn't tell who
18  you were looking at. I'm sorry. And I couldn't
19  quite hear what you were saying.
20      DEPT. OF CORRECTION: We are brothers.
21      THE COURT: You and Danny DeVito and
22  Arnold Schwarzenegger all at one time, huh?
23      You brought the defendant over?

Page 24

1      DEPT. OF CORRECTION: No, I didn't. I
2  just brought him upstairs.
3      THE COURT: Okay. Have you had occasion
4  to talk to him?
5      DEPT. OF CORRECTION: No.
6      THE COURT: Did you hear him talk to
7  anybody else?
8      DEPT. OF CORRECTION: No, I don't recall.
9      THE COURT: Ma'am, you are?
10      DEPT. OF CORRECTION: Corporal May
11  Glasser (PH).
12      I brought the defendant from the cell
13  block upstairs. I asked him if he had picked a jury
14  yet because he was wearing shackles. He said no, he
15  had not picked a jury. I asked him to sit down so I
16  could remove his shackles before we came upstairs.
17  He had no problem understanding my directions.
18      THE COURT: Did you hear him speak to
19  anybody else?
20      DEPT. OF CORRECTION: Just to me, sir.
21      THE COURT: Thank you, ma'am.
22      Officer or Corporal Boyce, did you bring
23  the defendant over, upstairs?

Page 25

1 DEPT. OF CORRECTION: I just brought him
2 upstairs.
3 THE COURT: Did you have occasion to
4 either speak to him or hear him speak?
5 DEPT. OF CORRECTION: No.
6 THE COURT: Okay. Do you know who
7 brought him over?
8 DEPT. OF CORRECTION: He probably came
9 over on the bus this morning.
10 THE COURT: All right, thank you.
11 While we'll finish the colloquy, I think
12 he can probably understand enough. Take the podium.
13 Do you have in your file his letters,
14 Mr. Figliola?
15 MR. FIGLIOLA: Your Honor, what I have
16 is, I have a typewritten letter from Mr. Ortiz, a
17 handwritten letter from Mr. Ortiz, and three letters
18 that I sent to Mr. Ortiz.
19 THE COURT: May I see them, please?
20 There's a letter -- and I'll give them back to you
21 after we make copies -- marked February 7, 2003, from
22 you to Mr. Ortiz, re discovery: "Please enclosed
23 find a copy of the motion to suppress that's been

Page 26

1 filed on your behalf. At this time I do not know
2 when it will be held. I've also enclosed a copy of
3 the first plea offer which was extended by the State,
4 refused by us. A copy of the discovery is also
5 enclosed. Respectfully yours." That was dated
6 February 7, 2003.
7 Do you know or did Mr. Ortiz ever
8 indicate that he got this letter?
9 MR. FIGLIOLA: Your Honor, at the
10 suppression hearing, he indicated that he did have
11 that.
12 THE COURT: Did he indicate whether he
13 had the opportunity to review the motion to suppress
14 and the discovery that you sent to him?
15 MR. FIGLIOLA: I asked him if he received
16 the package and if he reviewed it. Whether he
17 understood it or not, I can't comment on. But he did
18 receive it. And he acknowledged receiving it.
19 THE COURT: At any time between your
20 appointment and -- looks like October -- up to the
21 present, did he in any way indicate he was unable to
22 speak or understand English?
23 MR. FIGLIOLA: Your Honor, not to my

Page 27

1 recollection. Mr. Ortiz told me just as we were
2 going through the colloquy, but I do not have a
3 recollection of it, that at one of the hearings, he
4 said -- I guess it would have been a female bailiff
5 interpreted for him. I have no recollection of that.
6 And I'm not sure where it would have been.
7 Certainly, it wouldn't have been at the suppression
8 hearing or the preliminary hearing. I don't know
9 what he is referring to.
10 THE COURT: We're going to have to take
11 the baby out of the here, ma'am, please.
12 MR. FIGLIOLA: I have no recollection of
13 that, your Honor.
14 THE COURT: There appears to be an
15 undated letter which I'll have marked as Court's
16 Exhibit No. 2. It says, "Respectfully speaking, I
17 would like to talk about the -- what the police did
18 on the day of my arrest. Quote, I sat in my friend's
19 car and I never got a chance to do anything. As soon
20 as I got into the car, the police officer put his gun
21 to the window. They never asked me for no type of
22 identification. I have my driver's license here
23 present with me at Gander Hill facility. Also,

Page 28

1 respectfully speaking, I will fill out a property
2 form and release it to you to show you proof that I
3 have my license on me on the day of my arrest. Thank
4 you for taking the time out to read this letter. God
5 bless you." And then it has Ortiz, Isaias or
6 something. They appear two different kinds of ink,
7 but I don't know.
8 The third Court's exhibit letter dated
9 from you November 27, 2002, "I am in receipt of your
10 later dated November 18, 2002. At this point in
11 time, please be advised that, on November 25, 2002, a
12 discovery letter was filed with the State of
13 Delaware. We have not received a reply to that. It
14 is hopeful that we will have sufficient information
15 at your case review so a determination as to whether
16 or not a suppression motion can be made appropriate.
17 At this time I have not reached a determination.
18 Respectfully yours."
19 Do you know whether he got this letter?
20 MR. FIGLIOLA: Yes, your Honor.
21 THE COURT: Did he indicate any
22 difficulty understanding this letter or what you said
23 to him?

23

Page 29

1    MR. FIGLIOLA: I don't believe so. I
2 never -- to make the record straight, I never
3 actually said to him, "Did you get my letter of
4 October -- or November 25?" Did you get my letter of
5 November 27? We did, however, speak about the
6 circumstances leading to his arrest that night that
7 he addressed in his handwritten letter. Based on
8 what he indicated to me, as well as what we -- what
9 was obtained through discovery, it was deemed
10 appropriate that a suppression motion would be filed.
11 So, that was done, both on what was discovered and
12 what I learned from Mr. Ortiz. So, I have to assume,
13 your Honor, that he did receive my letters.
14    THE COURT: Okay. Then, I am -- I have a
15 letter dated November 25, 2002, from you to him,
16 indicating that you had been appointed by the
17 Superior Court to represent him and please get in
18 touch with your office. That's dated November 25.
19    However, on November 18, he wrote to you,
20 or a typewritten letter was sent to you saying, "As
21 you know, you represented me in the above case. We
22 met a couple of weeks ago." So, apparently that
23 predated that.

Page 30

1    MR. FIGLIOLA: Right.
2    THE COURT: "And at that time, you told
3 me you were planning to meet with the prosecutor and
4 detective. You said that there may be some problems
5 with the manner in which the police seized the
6 evidence, including a lack of probable cause or
7 proper warrants. I am writing to find out whether or
8 not you had a chance to meet with the prosecutor
9 and/or the detective to discuss the status of my
10 case. If you could let me know the status of my case
11 and send any -- it says any but it should be "me,"
12 "any relevant discovery materials, I will be
13 grateful. Thank you. Also, if you could advise me
14 when is my next Court date I would appreciate it.
15 Sincerely, and it's typewritten but not signed.
16    Did you meet with him a couple weeks
17 before November 18?
18    MR. FIGLIOLA: Yes. What happens,
19 your Honor, I represented Mr. Ortiz at his --
20 appointed by the Court of Common Pleas to represent
21 Mr. Ortiz at his preliminary hearing. What generally
22 happens is, after we represent them at the
23 preliminary hearing, we then receive an order from

Page 31

1 the Superior Court when the case is transferred to
2 Superior Court. At that point in time, my office
3 sends out the standard letter of representation as
4 well as a discovery letter and a letter to the Public
5 Defender's office, asking for any information that
6 they have been supplied with by the State. That's
7 why the answer to your question is yes, I had met him
8 before the October -- before the November 25 letter
9 got out, but the order from the Superior Court comes
10 after the preliminary hearing.
11    THE COURT: So, you had already met with
12 him in Court of Common Pleas?
13    MR. FIGLIOLA: Yes, your Honor, and we
14 had a preliminary hearing.
15    THE COURT: Approximately how long did
16 that hearing last?
17    MR. FIGLIOLA: It was, I believe, just
18 Detective Rodriguez, direct and cross. Probably
19 would have been maybe a 20- or 25-minute hearing.
20    THE COURT: Did you meet with him before
21 that hearing?
22    MR. FIGLIOLA: Yes.
23    THE COURT: Did he have any indication --

Page 32

1 give you any indication that he had any difficulty
2 understanding what was testified to at that hearing?
3    MR. FIGLIOLA: No, your Honor. In fact,
4 my recollection is that the hearing was postponed a
5 week because the codefendant needed an interpreter.
6    THE COURT: Same codefendant that's here?
7    MR. FIGLIOLA: I'm not sure if -- it may
8 have been. I'm not sure, because there was
9 another -- there were other codefendants.
10    THE COURT: Did he ask or make any
11 requests for a translator at that point?
12    MR. FIGLIOLA: No, your Honor. The first
13 time he asked for a translator was this morning.
14    THE COURT: And that was here in the
15 courtroom?
16    MR. FIGLIOLA: Yes.
17    THE COURT: And you talked to him earlier
18 this morning?
19    MR. FIGLIOLA: Yes, your Honor.
20    THE COURT: And he did not indicate any
21 difficulty understanding or speaking English at that
22 time?
23    MR. FIGLIOLA: No, he did not.

A24

Page 33

1    THE COURT: All right. That's five
2 pieces of correspondence marked as Court exhibits,
3 ma'am, and we'll return the -- it's okay if we keep
4 the letters, we'll give you copies.
5        MR. FIGLIOLA: That's fine.
6        THE COURT: All right. Mr. Ortiz, where
7 were you born?
8        MR. ORTIZ: Puerto Rico.
9        THE COURT: And how long have you lived
10 in this country or in this state?
11        MR. ORTIZ: In Delaware?
12        THE COURT: Yes.
13        MR. ORTIZ: Like, for almost two years.
14        THE COURT: And when did you come to the
15 continental United States?
16        MR. ORTIZ: It was, like -- like, seven
17 years ago.
18        THE COURT: Okay. And how much education
19 do you have?
20        MR. ORTIZ: Not much.
21        THE COURT: Okay. Can you quantify that
22 for me, please?
23        MR. ORTIZ: Like eight.

Page 34

1    THE COURT: You went to the eighth grade?
2        MR. ORTIZ: Eighth grade.
3        THE COURT: And that was in Puerto Rico?
4        MR. ORTIZ: Yeah.
5        THE COURT: When were you born?
6        MR. ORTIZ: 3/34/65.
7        THE COURT: 3/34.
8        MR. ORTIZ: 3/24/65.
9        THE COURT: So that makes you 38?
10        MR. ORTIZ: Yeah, almost.
11        THE COURT: Okay. You've got to be 38
12 because your birthday is in March. So, you are 38?
13        MR. ORTIZ: Yep.
14        THE COURT: All right. And what did you
15 do for a living? Tell me a little bit about your
16 professional background.
17        MR. ORTIZ: I work.
18        THE COURT: Okay. How did you work? Or
19 what kind of work did you do?
20        MR. ORTIZ: Hmm. I work like, you know,
21 from -- I don't even -- I was like back and forth to
22 my country.
23        THE COURT: Well, Puerto Rico is part of

Page 35

1 the United States, it's a commonwealth. What I'm
2 saying, Puerto Rico is a part of the United States,
3 so you went back and forth to your country. You
4 never left your country.
5        MR. ORTIZ: Yeah, you're right about
6 that.
7        THE COURT: People blew up part of
8 Congress once because they were fighting over that, I
9 think, because it was a -- remember, the Puerto Rico
10 nationalists planted a bomb about 40, 50 years ago?
11 So, what did you do for a living?
12        MR. ORTIZ: I work in, like,
13 construction.
14        THE COURT: Construction?
15        MR. ORTIZ: Sometimes I give to other
16 people.
17        THE COURT: And the last job, when you
18 came to Delaware, what did you do for a living?
19        MR. ORTIZ: That's right, I was working.
20        THE COURT: Construction?
21        MR. ORTIZ: Mm-hmm.
22        THE COURT: Who did you work for?
23        MR. ORTIZ: You know, I was working with

Page 36

1 my people only for -- when people call up, we go to
2 the house.
3        THE COURT: Yeah, I understand, in the
4 business you were in, you probably did get calls to
5 go to people's houses. But what did you -- I mean,
6 you worked for somebody, or worked with somebody.
7        MR. ORTIZ: Yeah, it was somebody.
8        THE COURT: Who was that?
9        MR. ORTIZ: My friend, he -- I don't know
10 where he is now.
11        THE COURT: I didn't ask you where he
12 was. I just asked you what is his name. I'm about
13 to ask you who he was, his name.
14        MR. ORTIZ: Ray, Raymond.
15        THE COURT: Raymond have a last name?
16        MR. ORTIZ: I know him only from Raymond.
17        THE COURT: You only seem to know either
18 the last name or the first name. Okay, that's fine.
19        And you and Raymond worked together, you
20 build houses?
21        MR. ORTIZ: Mm-hmm.
22        THE COURT: Right?
23        MR. ORTIZ: Mm-hmm.

Page 37

1  THE COURT: And tell me the house that
2  you built, or you helped build.
3  MR. ORTIZ: We paint.
4  THE COURT: Tell me the house you
5  painted.
6  MR. ORTIZ: We -- I can explain to my
7  Latino.
8  THE COURT: Well, you can tell me the
9  location.
10  MR. ORTIZ: You want to say that again.
11  THE COURT: Yeah, you want to tell me
12  where the house was that you painted?
13  MR. ORTIZ: Okay. We work at like, hmm,
14  New Castle, New Castle.
15  THE COURT: Okay. Where in New Castle?
16  MR. ORTIZ: We go all over.
17  THE COURT: Who paid you?
18  MR. ORTIZ: Who paid me?
19  THE COURT: Yeah.
20  MR. ORTIZ: My friend, Raymond.
21  THE COURT: Oh. You never dealt with the
22  homeowner yourself, huh?
23  MR. ORTIZ: No.

Page 38

1  THE COURT: Did he pay Social Security
2  for you or anything like that?
3  MR. ORTIZ: No.
4  THE COURT: Did you have any benefits,
5  like health insurance?
6  MR. ORTIZ: No.
7  THE COURT: So, if you got sick, what
8  happened to you? You never got sick?
9  MR. ORTIZ: No, thank God, no.
10  THE COURT: So, you did painting and
11  other work like that over two years in the State of
12  Delaware and, then, you were arrested.
13  Do you remember writing any of these
14  letters?
15  MR. ORTIZ: Okay. I got, like -- you
16  know, in Delaware, I got, like, not two years because
17  I got almost -- he's already -- he said he was in
18  there for two years but he's been in jail for a year.
19  THE COURT: Okay. So, you worked for a
20  year before you got arrested and you met the young
21  lady back there and you have a child by her.
22  MR. ORTIZ: Yes, sir.
23  THE COURT: Okay. So these letters that

Page 39

1  you wrote, do you remember them, or that are
2  supposedly from you?
3  THE DEFENDANT: Mm-hmm.
4  THE COURT: Did you write those letters?
5  MR. ORTIZ: No. My friend.
6  THE COURT: This is Brown?
7  MR. ORTIZ: Brown, yeah.
8  THE COURT: I remember Brown. Brown is
9  in jail, Raymond paints.
10  MR. ORTIZ: He went home.
11  THE COURT: We'll find out where Brown
12  was. That's real easy to trace. We'll bring Brown
13  in here, too. I'm sure he'll be real glad to see
14  you.
15  So, Brown wrote the letter, you didn't
16  write the letters yourself? Is that a "Yes" or "No"?
17  MR. ORTIZ: Say what? Say it again.
18  THE COURT: Brown wrote the letters for
19  you?
20  MR. ORTIZ: Yes, sir.
21  THE COURT: Okay. Now, Brown is what
22  racial identity? Is he black, white?
23  MR. ORTIZ: He is black.

Page 40

1  THE COURT: Okay. And is he Hispanic?
2  MR. ORTIZ: No, black.
3  THE COURT: Well no, no, black refers to
4  the Negro race, which is one thing. Ethnicity is
5  like whether you're Hispanic or American or Swedish
6  or something else. You can be black and be Hispanic
7  or white and be Hispanic.
8  MR. ORTIZ: Black American.
9  THE COURT: I learned that along the way.
10  Now, so, Mr. Brown, he was not Hispanic;
11  right?
12  MR. ORTIZ: Mm-hmm.
13  THE COURT: He was just like a regular
14  person, like me?
15  MR. ORTIZ: Hmm?
16  THE COURT: My color?
17  MR. ORTIZ: Yeah.
18  THE COURT: Now, Mr. Brown speaks
19  Spanish?
20  THE DEFENDANT: No. But he understands
21  my English, my broken English.
22  THE COURT: Oh, okay. So, Mr. Brown
23  didn't speak Spanish, he wasn't Hispanic, but he

A26

Page 41

1  understood you, he didn't have any problem
2  understanding you; right? Mr. Brown, he was not like
3  a doctor or a lawyer or a judge, was he? Is that no?
4       MR. ORTIZ: Because -- no, he tried --
5  that's right, he tried to understand what I say.
6       THE COURT: And he did a pretty good job
7  because -- let me have those letters again. He did a
8  pretty good job, didn't he?
9       MR. ORTIZ: Mm-hmm.
10      THE COURT: Now, Mr. Brown, you don't
11 know what he did for a living before he got arrested,
12 do you?
13      MR. ORTIZ: Mm-mmm.
14      THE COURT: He never told you what he
15 did?
16      MR. ORTIZ: No.
17      THE COURT: How long was he your cell
18 mate?
19      MR. ORTIZ: Almost about five months.
20      THE COURT: Okay. And, so, Mr. Brown
21 wrote this handwritten letter for you?
22      MR. ORTIZ: Mm-hmm.
23      THE COURT: Is that a yes?

Page 42

1       MR. ORTIZ: Yes, sir.
2       THE COURT: And Mr. Brown typed this
3  letter for you dated September 8 -- November 18?
4       MR. ORTIZ: No, I think it was in the law
5  library.
6       THE COURT: He did it for you in the
7  library?
8       MR. ORTIZ: It was a fellow, but he speak
9  Spanish.
10      THE COURT: What was the name of the
11 person who did this for you?
12      MR. ORTIZ: I don't know his name because
13 he working over there. He working over there in the
14 law library.
15      THE COURT: Was he black, white?
16      MR. ORTIZ: White.
17      THE COURT: Was he Hispanic? Did he
18 speak Spanish.
19      MR. ORTIZ: He speak Spanish, too, yeah.
20 But I don't know his name.
21      THE COURT: That's all right, we can find
22 that out, because it has to be around November 18.
23 That's pretty easy.

Page 43

1       MR. ORTIZ: He's still there.
2       THE COURT: He's probably going to be
3  there for a while.
4       Mr. Brown, who was an African-American,
5  didn't speak Spanish, he understood you, he didn't
6  have any problems; right? So he wasn't a doctor,
7  lawyer, he wasn't -- you don't know how well educated
8  he was. He was just a regular guy? Is that -- you
9  have to answer.
10      MR. ORTIZ: Yes, sir.
11      THE COURT: Okay. I just want to make
12 sure. And have you filed any grievances while you
13 were in prison? Have they mistreated you. Have they
14 mistreated you?
15      MR. ORTIZ: No.
16      THE COURT: So, have you talked to the
17 guards there?
18      MR. ORTIZ: To the police?
19      THE COURT: No, I'm talking about to
20 those guys in blue, any of them.
21      MR. ORTIZ: Oh, yeah, the CO, yeah.
22      THE COURT: Okay. What's your CO's name.
23 Who's your favorite CO over there.

Page 44

1       MR. ORTIZ: That's a lot of them.
2       THE COURT: But there's got to be one you
3  like better than others.
4       MR. ORTIZ: Yeah, but I don't got no
5  favorite.
6       THE COURT: You like them all?
7       MR. ORTIZ: Yeah.
8       THE COURT: I understand. Has one been
9  there longer than the other on your pod?
10      MR. ORTIZ: Yeah.
11      THE COURT: And who is he, or she, his
12 name, her name?
13      MR. ORTIZ: Okay. You can say like
14 Ms. Rivera.
15      THE COURT: Okay. Miss Loretta, she
16 doesn't have a last name.
17      MR. ORTIZ: Rivera.
18      THE COURT: Loretta?
19      MR. FIGLIOLA: Rivera, your Honor.
20      THE COURT: Do we know Miss Rivera?
21 That's all right, we'll find her.
22      Anybody else?
23      MR. ORTIZ: There's a lot of them, but I

A27

Page 45

1  don't know their names like that.

2       THE COURT: Okay, I can understand that.

3       Have you sought any medical attention

4  since you've been over at Gander Hill?

5       MR. ORTIZ: Yeah, I was -- yeah, one

6  time.

7       THE COURT: And what was that for?

8       MR. ORTIZ: For -- they call me because

9  they -- they said it like --

10       THE COURT: Routine exam?

11       MR. ORTIZ: Yeah.

12       THE COURT: Okay. Twice?

13       MR. ORTIZ: Mm-hmm.

14       THE COURT: Did you have to write

15  anything or sign anything while you were there?

16       MR. ORTIZ: Yeah.

17       THE COURT: What was that?

18       MR. ORTIZ: It's my name. I sign my name

19  and that's it.

20       / THE COURT: All right. Anything else you

21  want to tell me about your -- oh, did you meet with

22  Mr. Figliola at the first case review and the second

23  case review?

Page 46

1       MR. ORTIZ: No, not if I try and see her.

2       THE COURT: Mr. Figliola, he's a him. /

3       MR. ORTIZ: Oh, yeah.

4       THE COURT: At least, I think he is.

5       MR. ORTIZ: Yeah.

6       THE COURT: And you had a first case

7  review; right?

8       MR. ORTIZ: Yeah.

9       THE COURT: And you understood what the

10  case review was about? Did you talk to Mr. Figliola

11  on that date?

12       MR. ORTIZ: Mm-hmm.

13       THE COURT: And he explained to you what

14  the charges were and what the State's offer was?

15       MR. ORTIZ: Yes, sir.

16       THE COURT: Okay. At the final case

17  review, did you come before a judge?

18       MR. ORTIZ: Yes, sir.

19       THE COURT: Do you remember the final

20  case review judge was kind of like -- well, you might

21  not have seen him stand up -- kind of a tall judge

22  with brownish hair, kind of funny looking guy with a

23  mustache?

Page 47

1       MR. ORTIZ: It was a white dude, yeah.

2       THE COURT: I don't think he was funny

3  looking because of his ethnicity, but he was just

4  funny looking in general, kind of like Alfred E.

5  Newman. Remember him?

6       MR. ORTIZ: I don't know his name but I

7  remember him.

8       THE COURT: Okay. And he talked to you;

9  right?

10       MR. ORTIZ: Yes, sir.

11       THE COURT: You didn't have any problem

12  understanding him?

13       MR. ORTIZ: No.

14       THE COURT: And he didn't have any

15  problem understanding you, did he? Do you know, did

16  he seem to say, "Hey, what did you say?"

17       MR. ORTIZ: Hmm.

18       THE COURT: Let me see here.

19       All right. Is Raymond Spanish?

20       MR. ORTIZ: Yeah.

21       THE COURT: Hispanic? Anything else you

22  want tell me about why you think you need an

23  interpreter now?

Page 48

1       MR. ORTIZ: Yeah, for the same reason,

2  you know, I cannot speak too much like that.

3       THE COURT: Well, no decision has been

4  made whether you're going to take the stand; right?

5       Right, Mr. Figliola?

6       MR. FIGLIOLA: Not at this time,

7  your Honor.

8       THE COURT: Okay. And you've had no

9  problem communicating with Mr. Figliola up until now,

10  did you?

11       THE DEFENDANT: I said, "Let's do it,"

12  like that. If he -- I can call --

13       THE COURT: Mr. Ortiz, see, I don't think

14  you understand our respective roles. You don't get

15  to tell me what we do. I tell you because I'm the

16  judge, and at this point, I have full -- you ever

17  heard the term plenary, so you understand what I

18  mean?

19       / MR. ORTIZ: Yeah, that's why, you know, I

20  don't want to go without somebody to be Spanish,

21  something like that, because I cannot -- I cannot --

22  I cannot tell you what I want to tell you, that's  /

23  why.

A28

Page 49

1 THE COURT: Well, you don't seem to have
2 any problem understanding me. I mentioned quantity,
3 I talked about Social Security, I talked about
4 benefits, I talked about medical complaints. You
5 know, I just used the term a lot of attorneys don't
6 follow, and you seemed to be able to understand and
7 respond appropriately. You seem to be oriented to
8 who you are, where you are, and what you are. You
9 seem to understand the difference between one's
10 racial identity and one's ethnic identity, because I
11 talked to you about those concepts. You seem to be
12 fairly conversant. I don't have any problem
13 understanding you and you don't seem to have any
14 problem understanding me. Interesting, the young
15 lady behind you asked had you picked a jury yet
16 because they wanted to take the shackles off, and you
17 said no, you had no problem understanding that
18 concept. You haven't told me where you requested any
19 Court have a translator and had any issues that you
20 needed a translator for in Gander Hill. You've met
21 with Mr. Figliola at least on four, five occasions.
22 You haven't had any problems understanding him. And
23 you got the discovery, didn't you, and reviewed that

Page 50

1 discovery, right, that Mr. Figliola sent you; right?
2 MR. ORTIZ: Say that again.
3 THE COURT: The discovery that the State
4 gave Mr. Figliola, you looked at that and you talked
5 to him about it; right? You reviewed it?
6 THE DEFENDANT: Well, I didn't understand
7 that, no, that part. Yeah.
8 THE COURT: Yeah, I thought you did. All
9 right. Well, I'm satisfied and I'll call over there.
10 I have find out this Rivera person and have them
11 brought over here, as well as somebody else who's
12 been over there. And I know a fair number of
13 Corrections officers over there, so I'll -- I'll make
14 sure somebody comes to supplement the record. But I
15 find, Mr. Ortiz, that whatever your problem is with
16 understanding and communicating, one, there's been no
17 election to take the stand. If we need to bring
18 somebody in to translate for you if you decide to
19 take the stand, that might be an option. But
20 Mr. Figliola will consider that. You don't seem to
21 have any problem articulating ideas that are concrete
22 and ideas that are philosophical. You don't seem to
23 have any problem understanding it. Plus, you've been

Page 51

1 through at least three Court appearances, and you
2 don't seem to have any problem understanding what was
3 said to you.
4 The discovery materials were in English,
5 weren't they, Mr. Figliola?
6 MR. FIGLIOLA: Yes, your Honor.
7 THE COURT: So, it seems to me -- and
8 Mr. Brown who translated for you, yeah, Brown --
9 yeah, it was Brown was not Spanish speaking, he
10 didn't seem to have any problem understanding. I
11 also want to make a part of the record, whatever his
12 educational background was, I would probably guess,
13 although I could be wrong, that it's less than
14 college.
15 And I think we're okay. See, sometimes
16 people like to make records, and I wanted you to have
17 the record -- to make a record.
18 I wanted to make a record. That's why I
19 called the young lady. Interesting. What had he
20 said about the relationship when it began prior to
21 her 16th birthday. But that's really interesting
22 from my perspective. But that's not before me and I
23 don't want to ask you anything about that because

Page 52

1 that might cause issues somewhere else along the
2 line.
3 But you don't seem to have any problem
4 understanding much of anything. It's kind of funny,
5 because I was looking at your codefendant and he has
6 asked consistently for a translator, and even he was
7 laughing at some of the stuff you said. So, it's
8 okay, you don't have to get into it just yet. The
9 playacting only goes so far. Come on. You think I
10 fell off the turnip truck onto the bench yesterday,
11 and it's not it. So you've made the record, you made
12 the request, and we are going to go forward, as you
13 might have guessed. But the record -- and I think
14 I'm fairly adept at this, or good at it, in case you
15 didn't understand adept. But I think you do. I
16 think I've established a factual record such that,
17 upon review, the fact that I have not granted your
18 request for a translater at the 11th hour, I think,
19 will be sustained. So, if not, we'll just do it
20 again, but I'm prepared to take that chance.
21 Mr. Figliola, is there anything else you
22 want to add, do you think I need to add, at least on
23 that issue?

Page 53

1    /MR. FIGLIOLA: Your Honor, I think it's
2  been covered. I just think, for the record, because
3  my client has indicated that he feels he needs an
4  interpreter, that I would ask for a continuance, I
5  think, your Honor. /
6    THE COURT: I understand. You don't have
7  any choice but to ask for it. Miss Kelsey?
8    MS. KELSEY: No, I -- I am unable to
9  supplement the record with whether or not the
10  defendant spoke English or Spanish at the time of his
11  arrest because, well, Detective Rodriguez was the
12  chief investigating officer and he doesn't speak
13  Spanish. Detective Silva was there and he does speak
14  Spanish, so I don't know if -- will or will not be
15  able to supplement the record.
16    THE COURT: Is the State -- does the
17  State concur with Mr. Figliola's request for --
18    MS. KELSEY: No, I believe the Court has
19  made an adequate record.
20    THE COURT: I mean, but do you -- are you
21  agreeing to a continuance?
22    MS. KELSEY: No. No.
23    THE COURT: Okay. Mr. Tease, I don't

Page 54

1  know if you have a dog in this.
2    MR. TEASE: I don't think much of what
3  your Honor, just to again put on the record, not
4  again but to put on the record, I guess, our
5  objection to going forward. Suppose something could
6  come up at trial that would possibly affect my
7  client's case. I don't know that that's going to
8  happen, but there's that possibility. So, we can go
9  ahead and put that objection on the record.
10    THE COURT: Your objection is going
11  forward without a translator for Mr. Ortiz?
12    MR. TEASE: No, and the theory is sort of
13  attenuated, your Honor. If he doesn't understand
14  what's going on, it may affect, you know, his
15  decision to take the stand, to not take the stand.
16  And if so, that could --
17    THE COURT: Were any statements given?
18    MR. ORTIZ: He did give a statement
19  implicating my client.
20    THE COURT: Is the State going to attempt
21  to introduce that?
22    MS. KELSEY: It's news to me.
23    MR. TEASE: Which is fine.

Page 55

1    THE COURT: You're saying Ortiz gave a
2  statement against your client? The State doesn't
3  have it? Do you have it?
4    MR. TEASE: I do, your Honor, unless I've
5  gotten -- unless it was a different codefendant. No,
6  it was Mr. Ortiz indicated a purchase was made, I
7  think, from my client.
8    THE COURT: You don't have it,
9  Miss Kelsey.
10    MS. KELSEY: No. I have D1, which would
11  be Miss Ayala says she got a quarter ounce of crack
12  from D4, who is Daniel Farmer.
13    THE COURT: Okay. You don't have any
14  statement to introduce, so we don't have any Bruton
15  problem.
16    MR. TEASE: I understand. If that's the
17  case, that's good.
18    THE COURT: You don't have any basis to
19  request a continuance; right?
20    MR. TEASE: Well, I mean, if the Court
21  would allow it, I'd like my objection to stand just
22  because --
23    THE COURT: I don't mind it standing. I

Page 56

1  just want to understand it. There's got to be some
2  legal basis for it.
3    MR. TEASE: Well, it's speculation, that
4  somehow it affects what Mr. Ortiz decides to do at --
5  you know, I can't even imagine what the circumstances
6  could be, your Honor. But that's --
7    THE COURT: That's what I'm trying to
8  figure out. You represent Mr. Rivera; right?
9    MR. TEASE: Yes, sir.
10    THE COURT: So, if Ortiz takes the stand,
11  there's no problem. And since there's no statement
12  from Ortiz against Rivera, I don't understand how you
13  would want a continuance. I'll sever your guy if you
14  want. But, I mean, I'm not sure -- are you asking
15  for a severance?
16    MR. TEASE: No, I wasn't getting that
17  far, your Honor.
18    THE COURT: Then, I can't understand why
19  you would ask or join in Mr. Figliola's request for a
20  continuance. A severance would cure whatever problem
21  there is for you. I mean, but I don't know what
22  problem there is. I mean, I can't -- because he
23  doesn't have a translator, is there a common defense

A17

Page 57

1 in which case they could use yours?

2        MR. TEASE: No, sir, no. They're pretty

3 unrelated, actually.

4        THE COURT: Okay. So, if there's no

5 basis for severance, I don't know that there's any

6 basis for your client to ask for a continuance

7 because he doesn't have a translator, particularly if

8 they're defenses are unrelated.

9        MR. TEASE: Yeah, I understand what

10 you're saying, your Honor. Again, I admit, it's

11 speculative. I cannot predict.

12        THE COURT: Speculative, Mr. Tease, is

13 putting it politely.

14        MR. TEASE: I would hate for it to come

15 up later after trial.

16        THE COURT: I note that you've made it,

17 and I also note that I don't see any basis for it.

18 You aren't able to articulate any, but it's there and

19 should I be found wrong, you can pile on with

20 Mr. Figliola.

21        MR. TEASE: Yes, sir.

22        THE COURT: All right. Now, Mr. Ortiz,

23 the State has offered you a plea of guilt for up to

Page 58

1 eight years in prison. Was that what it is,

2 Miss Kelsey?

3        MS. KELSEY: Yes.

4        THE COURT: Did you understand that,

5 Mr. Ortiz?

6        MR. ORTIZ: Yeah.

7        THE COURT: Have you had an opportunity

8 to review the document that Mr. Figliola has which

9 sets forth the plea agreement?

10        MR. ORTIZ: Yeah, I see it.

11        THE COURT: You already reviewed it. Did

12 you have any problems understanding what the terms of

13 the plea agreement were?

14        MR. ORTIZ: Yeah, I understand that.

15        THE COURT: Okay. Did you have the

16 opportunity to fully discuss the matter, whether you

17 should or should not enter a guilty plea, with

18 Mr. Figliola? You have the opportunity to discuss it

19 the with him, Mr. Figliola, your attorney?

20        MR. ORTIZ: Yeah.

21        THE COURT: You have to respond verbally.

22        MR. ORTIZ: Yep.

23        THE COURT: Okay. Did you understand

Page 59

1 what the State's offer was?

2        MR. ORTIZ: Yes, sir.

3        THE COURT: All right. Do you need any

4 additional time to discuss that matter with

5 Mr. Figliola?

6        MR. ORTIZ: No, I'm all right.

7        THE COURT: Okay. And what was your

8 decision on the State's plea offer?

9        MR. ORTIZ: Say no.

10        THE COURT: Okay. Have you had any drugs

11 and/or alcohol within the last 48 hours?

12        THE DEFENDANT: Who, me?

13        THE COURT: I wasn't asking him.

14        MR. ORTIZ: No.

15        THE COURT: Are you now, or have you been

16 within the past two years, a patient in a mental

17 institution or under the care of a psychiatrist or

18 psychologist?

19        MR. ORTIZ: No, sir.

20        THE COURT: You never had any mental

21 problems or emotional issues; right?

22        MR. ORTIZ: No, sir.

23        THE COURT: I mean, there's nothing to

Page 60

1 suggest it. I just have to ask the question.

2        MR. ORTIZ: Mm-hmm.

3        THE COURT: Mr. Figliola, is there any

4 indication but that he understood the State's plea

5 offer?

6        MR. FIGLIOLA: Your Honor, I went over it

7 with Mr. Ortiz. I explained to him that we lost the

8 suppression hearing, that the State's evidence

9 probably will result in a conviction, that he will

10 probably get a minimum mandatory 18 years in jail.

11 And even though the State's offer to eight years in

12 jail, eight years minimum mandatory in jail, is a

13 stiff penalty, it's much better than 18 years in

14 jail.

15        THE COURT: Well, that's the minimum.

16        MR. FIGLIOLA: That's the minimum.

17        THE COURT: That's if there were nothing

18 else. And the judge is not bound by the minimum;

19 right?

20        MR. FIGLIOLA: That's correct,

21 your Honor.

22        THE COURT: Okay. So, the range was from

23 18 to what?

Page 61

1    MR. FIGLIOLA: Eighteen to 40.
2       THE COURT: I thought it was more than
3  that.
4       MR. FIGLIOLA: It's 20 on --
5       THE COURT: On each trafficking.
6       MR. FIGLIOLA: On each trafficking is 20,
7  that's correct, your Honor. Right, because he's got
8  two possessions with intent to deliver.
9       THE COURT: So, that's another 20, 10 on
10 each, a vehicle, zero to five, so we're up to 65. We
11 got two dwellings -- I mean, a dwelling and a
12 vehicle, so that's 70. A conspiracy.
13      MR. FIGLIOLA: It's 72.
14      THE COURT: Oh, no. Wait a minute, is
15 there three? Three use of a dwellings or vehicles.
16 So, that's 75. Plus, we got a conspiracy second,
17 which is zero to three which is -- is it zero to
18 three or zero to two?
19      MR. FIGLIOLA: Zero to three, your Honor.
20      THE COURT: So, that's 77.
21      MR. FIGLIOLA: The endangering the
22 welfare of a minor.
23      THE COURT: We got a tampering, I think

Page 62

1  that's zero to two as well. So, we're up to 79.
2  Endangering is a misdemeanor. Yeah, I think
3  that's -- that's 80. And resisting arrest is another
4  year. So, that's 81. And possession of drug
5  paraphernalia, 82.
6       So, I think Mr. Ortiz faces a minimum of
7  18 years and a maximum of what I count of 82 years.
8       MR. FIGLIOLA: Eighty-two.
9       THE COURT: Do you understand that,
10 Mr. Ortiz?
11      MR. ORTIZ: Yes, sir.
12      THE COURT: Okay. That's if you're
13 convicted on all counts. And I say I don't know what
14 the evidence is so I don't know.
15      And you discussed that with him,
16 Mr. Figliola?
17      MR. FIGLIOLA: Yes, I have, your Honor.
18 And at the final case review, the same explanation
19 was given to him from the bench.
20      THE COURT: Okay. I'm satisfied that he
21 understands the State's plea offer and that it's --
22 nobody's forcing you to go to trial, are they,
23 Mr. Ortiz?

Page 63

1       MR. ORTIZ: No, sir.
2       THE COURT: And you're electing to go to
3  trial and reject the State's plea offer of eight
4  years of your own free will?
5       MR. ORTIZ: Yeah, I'd like to go to
6  trial.
7       THE COURT: Yes, I want to make sure. I
8  have to make the record.
9       All right. I think, both, that he
10 understands the plea offer, that he understands and
11 can speak English, and I think we're prepared to go
12 forward. And we'll send for the jury panel and we'll
13 go ahead and go with it. And to the extent the
14 record is not complete, then I can live with that.
15      Now, send -- where's bailiff? Send for
16 the jury panel. I have to do the colloquy with the
17 other defendant.
18      Fellows, you should understand I
19 understand a little bit of Spanish. And I hear very
20 well, as the attorneys will tell you. And the part
21 of Spanish I do understand basically probably has to
22 do with some of the more negative phrases. So, I'm
23 just saying, like I tell attorneys, be careful what

Page 64

1  you say. I also read lips a little bit, too. It's
2  an occupational acquisition.
3       All right. For the record, would you
4  have Mr. Rivera state his full name and address.
5       MR. RIVERA: 233 Broom Street.
6       THE COURT: Okay. And how old is
7  Mr. Rivera?
8       MR. RIVERA: 49.
9       THE COURT: He ought to let you respond
10 before he starts to answer. I mean, I know he
11 understands a little bit.
12      And how much education does he have?
13      MR. RIVERA: In what?
14      THE COURT: In school.
15      MR. RIVERA: Seventh grade, not too much.
16      THE COURT: Apparently, State has made a
17 plea offer, and I gather Miss Kelsey, it's habitual
18 offender, A section status.
19      MS. KELSEY: Yes, your Honor.
20      THE COURT: It's trafficking and
21 conspiracy second. Only one of them would be habit
22 offender.
23      MS. KELSEY: Right. It would be on the

Page 65

1  trafficking.
2       THE COURT: And he would be facing three
3  to life?
4       MS. KELSEY: Yes.
5       THE COURT: And what would be the State's
6  sentencing recommendation?
7       MS. KELSEY: It depends on his record,
8  and it depends on whether or not he decides he wants
9  to talk to Detective Rodriguez and what he has to
10 say.
11      THE COURT: If he did all that, is there
12 a recommendation, or is that just depends?
13      MS. KELSEY: I -- I can't -- I haven't
14 heard what he would say.
15      THE COURT: Okay. I just didn't know.
16      MS. KELSEY: I can't evaluate it in a
17 vacuum.
18      THE COURT: Okay. Before I ask the next
19 question, what did Mr. Rivera do for a living?
20      MR. RIVERA: Where, outside? I work in a
21 car wash, cleaning cars.
22      THE COURT: And how long have you been in
23 the State of Delaware when he was arrested?

Page 66

1       MR. RIVERA: Since 1989, and I've been
2  living in Delaware 12 years.
3       THE COURT: Okay.
4       MR. TEASE: He's asking me, your Honor,
5  from 1989 until now.
6       THE COURT: What's 14 -- I forget.
7       THE INTERPRETER: Fourteen.
8       THE COURT: Stick with lawyering,
9  Mr. Tease.
10      Have you had the opportunity to discuss
11 with Mr. Tease the plea offer?
12      MR. RIVERA: No. To talk about what?
13      THE COURT: The plea offer.
14      MR. RIVERA: I do not understand.
15      THE COURT: The State's offer to allow
16 him to plead to some of the charges for a lesser
17 sanction, I guess.
18      MR. RIVERA: I do not understand.
19      THE COURT: Do we have a copy of his
20 record?
21      MR. TEASE: Your Honor, I have a copy of
22 his immediate sentencing form and a full printout of
23 his record as well.

Page 67

1       THE COURT: Has he been in the Superior
2  Court before?
3       MR. TEASE: Yes, sir.
4       THE COURT: For what?
5       MR. TEASE: Assault second in 1999,
6  unlawful sexual contact second in '89. I'm not sure
7  if that's Delaware or not. That's Delaware.
8  Apparently, escape second in 1992.
9       THE COURT: All right. Do you understand
10 what a plea offer is, Mr. Rivera?
11      MR. RIVERA: No, I do not know what that
12 means.
13      THE COURT: It is an offer made by the
14 State to allow you to enter a plea of guilt to less
15 than all the charges in the indictment, in exchange
16 for a lesser sentence than if you went to trial and
17 were found guilty on all the charges. Now, do you
18 understand?
19      MR. RIVERA: What charges are you talking
20 about?
21      THE COURT: Trafficking and conspiracy in
22 the second degree.
23      MR. RIVERA: You just said what?

Page 68

1       THE COURT: All right. You do not know
2  what I'm talking about?
3       MR. RIVERA: Not too much.
4       THE COURT: I want a copy of his record
5  to be marked as Court's exhibit.
6       MR. TEASE: Yes, sir.
7       THE COURT: Not a problem. We're still
8  going forward. I mean, it doesn't bother me. State
9  has offered you, and I'm sure you understand, to
10 plead to two charges, trafficking and conspiracy
11 second. And the sentence you would be exposed to
12 would be three years to life. Now -- and I haven't
13 looked up the number of charges, but it's still three
14 years to life. And I assume the State would make
15 some of the sentencing recommendation short of life.
16 So, but what you're faced with right now is being
17 allowed to plead to two charges with a possibility of
18 three years to life.
19      Mr. Tease, would you hand that to the
20 clerk. I want to mark that as a Court's exhibit.
21 I'll give it back to you.
22      MR. TEASE: I'm showing an AG office rap
23 sheet and, also, an NCIC search.

Page 69

1   MS. KELSEY: It's actually not
2   Mr. Tease's. It's mine.
3       THE COURT: Yeah.
4       MS. KELSEY: Just so the record is clear.
5       THE COURT: All right. Well, the report
6   is what it is. And he's got quite a few names here.
7       MS. KELSEY: That's why I gave it to
8   Mr. Tease. I wanted --
9       THE COURT: All right, that's fine. I've
10  explained the plea offer.
11      Mr. Ortiz, do you understand that offer?
12  I meant Rivera.
13      MR. RIVERA: I think so.
14      THE COURT: Okay. Would you like the
15  opportunity to discuss this matter further with
16  Mr. Tease?
17      MR. RIVERA: Now?
18      THE COURT: Si.
19      MR. TEASE: Yes.
20      MR. RIVERA: But talk about what with
21  him?
22      THE COURT: The plea offer, if you want
23  to. If you don't, fine.

Page 70

1       MR. RIVERA: But talk about what?
2       MR. TEASE: Your Honor, I don't know when
3   they're going to pick. If there would be a break for
4   lunch, I would ask for the opportunity.
5       THE COURT: Well, I will let you have
6   that opportunity, but we're to go ahead and pick.
7       Look, as interesting as this is,
8   Mr. Rivera has a record longer than me. He's been in
9   this Court on at least two occasions, facing serious
10  charges. And, Mr. Tease, I've watched you work for
11  at least 10 years, if not longer, and I know you're
12  pretty thorough in explaining situations,
13  particularly where you know you needed an interpreter
14  or translator. All of a sudden, there has been a
15  contagious failure of recollection and ability to
16  understand. And it's spread -- fortunately, it
17  didn't start at first table but it spread back.
18      Now, the Court is not stupid. And I've
19  been around for a long time. And I'm afraid I don't
20  accept this recent failure of recollection. And as a
21  matter of fact, I note specifically his appropriate
22  response or chuckle when Mr. Ortiz was coming up with
23  some of his more inane responses. And I couldn't

Page 71

1   quite hear exactly what he said, but I got the gist
2   of some of it. And something to the effect, "Is this
3   guy crazy?" So, I think he said that in English.
4   But he understands the concept, he understood, in my
5   opinion, and I so find as a matter of fact. If I'm
6   wrong, then, again, we'll simply do it over again.
7   But I don't think I'm wrong. I think this is an
8   attempt, a blatant ill-conceived attempt to delay the
9   proceedings and make a record in hopes that the Court
10  will make some sort of erroneous finding. If I have,
11  I have.
12      So, we'll go forward. And I understand
13  that he doesn't claim not to understand the plea
14  offer or the process. And it's -- I guess, given the
15  circumstances, I probably would do the same thing.
16  But okay, we'll go forward.
17      Mr. Tease, you will have the opportunity
18  to explain to him with the interpreter further. And
19  we have to -- the interpreter's name.
20      THE INTERPRETER: Grettel Huber,
21  your Honor.
22      THE COURT: You've been here a number of
23  times?

Page 72

1       THE INTERPRETER: Yes, your Honor.
2       THE COURT: You understand English;
3   right?
4       THE INTERPRETER: Perfectly.
5       THE COURT: So, all right. We'll go
6   forward with it, and we'll pick. And then we'll --
7   all right. Thank you, gracias, Mr. Rivera. We'll
8   whatever the Spanish word is for proceed. All right.
9       MR. TEASE: Thank you.
10      THE INTERPRETER: Thank you.
11      THE COURT: We're prepared to proceed.
12  Did we send for them?
13      How we going to do the order? I guess I
14  would be defendant one, State, defendant two. I have
15  to work it out. Is that how you normally do it?
16      MR. FIGLIOLA: How many strikes are you
17  giving the defense, your Honor?
18      THE COURT: I thought -- does it say the
19  per defendant or defense?
20      MR. FIGLIOLA: It calls for six for the
21  defense.
22      THE COURT: Okay.
23      MR. FIGLIOLA: So, it could be split up.

Page 73

1  So, your Honor can give us more in your discretion or
2  leave it at six.
3          THE COURT: There's no antagonistic
4  defense here; right?
5          MR. FIGLIOLA: No.
6          MR. TEASE: No, sir, your Honor.
7          THE COURT: We'll split it three/three,
8  State has six.
9          MR. FIGLIOLA: Thank you.
10         THE COURT: Unless you have some basis
11 for asking for more, I'll hear it. I just don't know
12 what it is.
13         MR. FIGLIOLA: Your Honor, if possible,
14 could we use the six together as opposed to
15 three/three?
16         THE COURT: Sure. I'm sorry. I thought
17 it was implicit if you wanted to. I didn't know.
18 They want to use them together. There's nothing to
19 stop them.
20         MS. KELSEY: Will they get six or will
21 they get 12?
22         THE COURT: No, they get six total.
23         MS. KELSEY: Okay. All right.

Page 74

1          - - -
2          (Untranscribed jury selection.)
3          - - -
4          THE COURT: Do the attorneys have any
5  problem if I change that juror's seat just so he's
6  closer to the end?
7          MR. FIGLIOLA: I don't.
8          THE COURT: I'll make him No. 2.
9          MR. FIGLIOLA: I don't have any problem.
10         MS. KELSEY: I think you'd better make
11 him No. 1, your Honor, or put him in No. 1 seat so he
12 won't have to go up the step.
13         THE COURT: Well, I mean, I don't feel
14 one way or the other.
15         MR. FIGLIOLA: I have no problem if he
16 sits in the No. 1 seat, your Honor, but I would like
17 the No. 1 juror to retain the foreman's spot.
18         MS. KELSEY: That's fine. That works.
19         MR. TEASE: We agree.
20         THE COURT: Okay. I'll see you in an
21 hour. Thank you.
22         Any exceptions to the jury as selected?
23         MR. FIGLIOLA: No, your Honor.

Page 75

1          MS. KELSEY: No, your Honor.
2          MR. TEASE: No, sir.
3          THE COURT: See you in an hour.
4          (Luncheon recess.)
5          MR. TEASE: Your Honor, if I may be
6  excused to get the prosecutor.
7          THE COURT: I was pointing at his wife,
8  gave me a hard time.
9          DEPT. OF CORRECTION: 10:00 o'clock, sir.
10         THE COURT: Let's not make fun of old
11 people.
12         DEPT. OF CORRECTION: I'm old, too.
13         THE COURT: That's why I said it.
14         MR. TEASE: Your Honor, on behalf of the
15 State, they're asking for five minutes. They're
16 talking, I think, to other witnesses. In
17 Miss Kelsey's words, they're trying to avoid a
18 mistrial. "Tell the judge, we have five minutes,
19 we'll be able to avoid a mistrial."
20         THE COURT: Okay.
21         MR. FIGLIOLA: Your Honor, when
22 Miss Kelsey comes in, there's a scheduling problem.
23 It's not really mine.

Page 76

1          MR. TEASE: It's mine.
2          MR. FIGLIOLA: But I bring it up.
3          MR. TEASE: The interpreter's not
4  available.
5          THE COURT: There's no interpreter
6  available tomorrow?
7          MR. TEASE: That's largely correct,
8  Judge.
9          THE INTERPRETER: It's not my fault.
10         MR. TEASE: May I explain, Judge?
11         THE COURT: Nobody understands anything,
12 anyway. What difference does it make? Come on, you
13 can smile.
14    Ma'am, I don't think you can bring sodas in.
15         MS. KELSEY: I'm sorry, your Honor. And
16 thank you for giving us a few minutes. I wanted to
17 explain to Miss Ayala what she can and cannot say so
18 that she doesn't volunteer things that are
19 inappropriate. And I appreciate the Court's time. I
20 think it will save us lots of time later.
21         THE COURT: Mr. Tease?
22         MR. TEASE: Your Honor, I'll try to be
23 brief. But there was an amenability hearing, I think

Page 77

1  you chaired, for a Christopher Mayer sometime ago
2  involving a home invasion. This codefendant is David
3  Daniels. And my understanding from Mr. Favata, who
4  is prosecuting, is that he even indicated to
5  your Honor on that day that there's not going to be
6  any plea offer in that case, that thing is going to
7  trial, which was the case all the way up until this
8  morning when that was scheduled for trial. So, based
9  on that, I told Miss Huber she was likely not needed
10  today and that Maria Perez, another translator, would
11  not be needed for tomorrow because I'm going to trial
12  on David Daniels. That pled out today to an
13  eight-year minimum mandatory with a PSI.
14        Miss Huber was kind enough to come in and
15  has also tried to make arrangements to be our
16  translator for tomorrow because Miss Perez is not
17  available now. She has to be in Court of Common
18  Pleas in the morning for a trial and, also, has an
19  afternoon calendar, I think either in Family Court or
20  CCP.
21        She has again tried to help out,
22  your Honor, and get somebody else to fill in, and
23  she's been unable to do that. So, it falls on me.

Page 78

1  And that's the bottom line, and we have a problem
2  with the translator tomorrow.
3        THE COURT: Mr. Tease, in what Court are
4  you in?
5        MR. TEASE: Superior Court.
6        THE COURT: And on the organizational
7  chart of courts, what two other courts does the
8  Superior Court trump?
9        MR. TEASE: Court of Common Pleas and
10  Family Court.
11        THE COURT: Good answer. I don't know
12  how we're going to work it out, but I got a double
13  defendant eight- or nine-count or 12-count, something
14  count, trial that's already started. And I will
15  speak to -- who is the attorney you're in front of
16  for tomorrow, ma'am?
17        THE INTERPRETER: We have the Suspension
18  and Insurance calendar in the morning and nonjury
19  trials in the afternoon Court of Common Pleas.
20        THE COURT: All right. I will talk to
21  Judge Smalls, who will probably want to shoot me, but
22  it won't be the first time.
23        MS. KELSEY: Your Honor, in Mr. Tease's

Page 79

1  defense, Mr. Favata did tell me --
2        THE COURT: I'm not blaming either one of
3  you. This falls under the heading of things happen.
4        MS. KELSEY: And he did tell us both we
5  could put our witnesses on call.
6        THE COURT: Well, the only fault is for
7  listening to Mr. Favata.
8        MS. KELSEY: No, Judge Herlihy told us we
9  could put our witnesses on call.
10        THE COURT: That aside, I know I was
11  being sarcastic talking to Mr. Tease, which he
12  understood. He didn't do anything wrong, the
13  interpreter didn't do anything wrong. I'm not sure
14  we have a problem. I'll talk to Judge Smalls. And
15  other than not being up to the 11th floor or a while,
16  I think we'll be okay.
17        What do you have in Family Court?
18        THE INTERPRETER: I have one arraignment,
19  but that can be taken care of.
20        THE COURT: Yeah. I'm not worried about
21  Smalls. Obviously, Judge Smalls and I are pretty
22  close friends but, even if we weren't, I don't think
23  he would jump up and down too much. It's just the

Page 80

1  kind of person he is. I'll take care of that. And
2  I'll just owe him, unfortunately, big time. He will
3  collect. But let me, before -- I'll go up there, if
4  we ever get done and take a recess, but I'll talk to
5  Smalls and I think we're okay. You two won't take
6  the heat, no matter what happens.
7        Let the record reflect I was only
8  kidding, that the Superior Court doesn't really trump
9  any courts. We're all equal.
10        All right. Can we bring the jury in now?
11        (Jury enters courtroom at 3:02 P.M.)
12        THE COURT: Sir, excuse me -- stop right
13  there. Come on up this way. We're going to try to
14  make it a little easier. Everybody else move down
15  one. To mess with that thing getting in and out of
16  there will drive you absolutely nuts. And the record
17  should reflect that he was No. 7, and we physically
18  switched -- moved everybody one so No. 7 could have
19  the easiest access and, but that doesn't change who
20  you are in terms of your original numbers and who's
21  foreperson. It just makes it easier because that
22  looks awkward, to do all that kind of stuff. And our
23  jury boxes, unfortunately, were not made accessible

Page 81

1 as well for anybody who has some difficulty.
2 All right. Neither side objects, we'll
3 proceed.
4 Swear the jury.
5 (Jury sworn.)
6 THE CLERK: You may be seated. Members
7 of the jury, you've all been severally sworn or
8 affirmed. Stand together and hear the evidence.
9 Your Honor.
10 THE COURT: Ladies and gentlemen, good
11 afternoon. We were delayed addressing, again, some
12 miscellaneous matters. There are a couple things I
13 want to bring to your attention.
14 First, you should not begin to discuss or
15 deliberate concerning any of the issues with which
16 you will be presented during this trial until you
17 have heard opening and closing statements by the
18 attorneys, all the evidence has been presented, and I
19 have instructed you as to the applicable law. We ask
20 you not to do so until everything is over, at least
21 in terms of the presentation and argument, because we
22 find, as a matter of human nature, once people begin
23 to discuss or deliberate over issues, it becomes that

Page 82

1 much harder for them to reevaluate positions
2 initially taken when presented with evidence or
3 argument that is more persuasive or which dictates
4 maybe a different result.
5 So, not even on recesses or breaks or
6 anything like that, and even such inconsequential
7 things as you may think, such as, "Gee, that witness
8 sure looked good," or, "That witness sure looked
9 bad," or X, Y and Z, even that is prohibited. And I
10 know it sounds kind of fundamental, but we've had
11 problems with that before.
12 Secondly, we ask that you not discuss
13 this case until everything is over and you have been
14 released as jurors with any friends, relatives or
15 significant others, and for pretty much the same
16 reason; but, also, these people will not have had the
17 benefit of what you're going to hear and see. We
18 don't want any outside taint in the process.
19 Thirdly, we ask that you avoid any media
20 coverage of this trial, should there be any. Now,
21 I'm not suggesting there will be, but I can't tell
22 you there won't be. Sometimes, the press stops in at
23 various trials just to see what's going on. But we

Page 83

1 ask that you have someone screen the local newscast
2 or newspaper reports before you look at them or
3 listen to them or see them.
4 Fourthly, we ask you to avoid any of the
5 scenes -- I mean, to avoid going to any of the scenes
6 that will be described in this matter. Jurors should
7 hear all things at the same time under similar
8 conditions and at the Court's direction.
9 Finally, if you should run afoul of any
10 of these admonitions, please let myself or the
11 bailiff know immediately.
12 Next, you will see that, at the second
13 defense table closest to the rear, you have a young
14 lady who's whispering to one of the defendants in
15 this matter. She's not being rude. As you might
16 guess, she's an interpreter. She's a licensed or
17 certified -- I forget what it's called -- Court
18 interpreter, and she is there and will be talking as
19 unobtrusively, I guess is the term, as possible. So,
20 if you hear a little slight murmuring, it's obviously
21 her, and it's permitted by the Court and, indeed,
22 constitutionally required, I believe, under certain
23 circumstances. So, I just wanted to let you know

Page 84

1 that's what that was and that's how we're doing it.
2 Now, we're going to go today. We usually
3 stop as close to 5:00 as we can get and resume at
4 10:00. If there are any problems that I foresee,
5 I'll let you know. Right now, I don't have any.
6 There's one matter I need to clear up in about an
7 hour to clear the schedule, but I think we're okay.
8 So, you know, you may get out early today, you may
9 not, but we'll go forward.
10 If anybody has any problems, any
11 employment verification, anything like that, you let
12 me know and I'll address it for you.
13 Everybody okay? All right. I believe,
14 having said that, we are prepared to proceed with
15 opening statements.
16 MS. KELSEY: Thank you, your Honor.
17 Ladies and gentlemen of the jury, good afternoon.
18 The easiest way to explain to you what
19 your job will be is to first explain to you what
20 happened and, then, I will explain to you what
21 happened and how that proves that the defendants
22 committed the offenses for which they have been
23 indicted.

Page 85

1    On October 18 of the year 2002, not quite
2  a year ago, the defendants Isaias Ortiz, who's
3  represented by Mr. Figliola -- and he's seated at the
4  table in front of us, Mr. Figliola is -- Anthony
5  Figliola is the person closest to you, and the
6  defendant Ortiz is the person next to him -- and
7  Nemensio Rivera, who is the person in the middle in
8  the back table -- and next to him, closest to you, is
9  his attorney who is Christopher Tease. But, anyway,
10  they were engaged in some drug dealing in the City of
11  Wilmington. And the Wilmington Police Department, on
12  October 18 of the year 2002, had a search warrant for
13  a residence which was -- which I will refer to as
14  1908 Lancaster Avenue. It was Apartment B. But
15  we'll refer to that as 1908 Lancaster Avenue. And
16  that's so you don't get confused about which
17  residence it is. They had a search warrant for that
18  residence.
19    Pursuant to the execution of the search
20  warrant -- they were doing surveillance. You know,
21  before they executed the search warrant, they kind of
22  watch the place, see what's going on, and a detective
23  by the name of Charles Emory was doing the

Page 86

1  surveillance. He observes the defendant Ortiz and a
2  person by the name of Som -- Solmari Ayala leave the
3  residence. Defendant is approximately 35 years old,
4  or better than 35 years old. Miss Ayala is -- it was
5  actually her 16th birthday. Nonetheless, they were a
6  couple. And they were observed leaving 1908
7  Lancaster Avenue.
8    They go around the corner and get in a
9  car, which you'll subsequently learn was a BMW. And
10  they get in that car and the police, because they
11  have just left the residence where they have a search
12  warrant, and because they have parked so far away
13  from the residence where the police had the search
14  warrant -- and they'll explain the significance of
15  all that -- the police stop the car. And when they
16  stopped the car and defendant is driving, Mr. Ortiz
17  is driving, and he has a set of keys that he is using
18  to drive the car, and Miss Ayala is in the passenger
19  seat. They stop the car. Neither of them have a
20  driver license, identification, so the police detain
21  them, and Miss Ayala tells them that she's 20. They
22  look in her -- her sweater, which she says it's her
23  sweater, and it's a woman's sweater, so even though

Page 87

1  they asked, they already know it's her sweater in the
2  back seat of the car. And they find a package of a
3  white powdery substance which turns out to be
4  cocaine. So, they take the defendant Ortiz and
5  Miss Ayala down to the Wilmington Police station.
6    Now, meanwhile, the other police officers
7  at the Wilmington Police Department execute the
8  search warrant at 1908 Lancaster Avenue. And in 1908
9  Lancaster Avenue, they find the defendant, Nemensio
10  Rivera, another person -- and another person by the
11  name of Danielle Farmer in that residence. And in
12  that residence, they find -- and they'll tell you
13  exactly where they found it. In some bedrooms and
14  some kitchen cabinets, they find more cocaine and
15  heroin. And they also find some things to package
16  those things for sale. And they'll tell you what
17  those things are when -- when they tell you about the
18  search of 1908 Lancaster Avenue.
19    Now, meanwhile -- and they execute that
20  search warrant. And of significance, they find
21  Nemensio Rivera has a large quantity of money in his
22  pocket, in addition to that.
23    Meanwhile, at the Wilmington Police

Page 88

1  Station, Miss Ayala's mother has arrived at the
2  police station and informed the police that she is
3  not the 20 that she says she is, but she is, in fact,
4  16. And they give the -- she gives the Wilmington
5  Police an address which is different from the address
6  that Mr. Ortiz had given the Wilmington Police with
7  regard to his bail information. So, the Wilmington
8  Police go to the address that the defendant had given
9  and the defendant Ortiz doesn't live there. And, so,
10  they go to the address that -- that Miss Ayala's
11  mother had given the Wilmington Police Department and
12  they have the keys with them. And, lo and behold,
13  the keys fit the mailbox and they fit the door to
14  that address that Miss Ayala's mother had given them.
15  So, the Wilmington Police get a search warrant for
16  1933 West Fourth Street.
17    Now, at 1933 West Fourth Street, they
18  find a large quantity of cocaine. And it's in two
19  packages, but they find a large quantity of cocaine
20  and, in fact, that quantity of cocaine is in excess
21  of a hundred grams of cocaine. They also find at
22  that second place, the 1933 West Fourth Street, they
23  also find a -- they find some pictures of Miss Ayala

Page 89

1  and they find some pictures of Miss Ayala and the
2  defendant Ortiz together.
3      So, those are the charges which are --
4  those are the facts. And what you get out of those
5  facts are a number of different charges.
6      First of all, the defendant Ortiz is
7  charged with trafficking in cocaine over a hundred
8  grams. Now, trafficking in cocaine has sort of a
9  common everyday meaning. You know, when you watch TV
10 and they have shows about drug dealers, they call
11 them traffickers. And, so, it has a sort of -- and
12 you think of planes and kilos and things like that.
13     But under Delaware law, it has a specific
14 meaning which is different from the everyday ordinary
15 meaning. Under Delaware law, if you are in
16 possession of -- then it was 5 grams but now it's 10
17 grams -- in excess of 10 grams of cocaine, then you
18 are guilty of trafficking in cocaine. And there are
19 levels of trafficking in cocaine, and one of those
20 levels, the highest level, is over a hundred grams of
21 cocaine. And that is so Ortiz, Mr. Ortiz, is charged
22 with trafficking in cocaine over a hundred grams.
23     Now, Miss Ayala, you'll notice her name

Page 90

1  is nowhere in -- in the indictment when you get a
2  chance to see the indictment. And I want to point
3  out that she's a juvenile, so her charges never came
4  to Superior Court; they went to Family Court. So,
5  while there are other people's names in the
6  indictment, hers is not one of them because she is
7  not 18 years of age. So, she's not -- she's not
8  listed as a defendant in any of these charges. But
9  he's charged with possession of over a hundred grams,
10 based on the drugs which were found at 1933 West
11 Fourth Street.
12     Now, a person by the name of Danielle
13 Farmer, who is one of the people that was at 1908
14 Lancaster Avenue, and, then, Mr. Ortiz and
15 Mr. Rivera, are also charged with a separate count of
16 trafficking in cocaine. And that's five to 50 grams
17 of a mixture containing cocaine. And that is the
18 other end of the spectrum with regard to trafficking
19 in cocaine, because it is more than 5 grams but less
20 than 50 grams. And that's based on the cocaine which
21 was found at 1908 Lancaster Avenue.
22     And I want to point out that Miss Ayala
23 will tell you when -- when she testifies -- and she

Page 91

1  will be the State's first witness -- that she will
2  tell you that Mr. Ortiz picked her up on this
3  particular day -- and it was her 16th birthday -- at
4  her mother's house. And they went to what she refers
5  to as the crack house -- and that's 1908 Lancaster
6  Avenue -- for the purpose of getting money from
7  Mr. Rivera. And she -- she's not certain if they, in
8  fact, left drugs for Miss Farmer and Mr. Rivera to
9  sell, but -- but it's her understanding that
10 Mr. Rivera sold the cocaine and Miss Farmer sold the
11 heroin.
12     The other charge that they are charged
13 with, those three people are charged with, and
14 actually another person, is possession with intent to
15 deliver cocaine. And that's Luis Amaro, Danielle
16 Farmer, or Isaias Ortiz, and Nemenzio Rivera. And
17 that is also, in fact, cocaine, and that is also from
18 this particular day. And then Miss Farmer,
19 Mr. Ortiz, and Mr. Rivera are also -- Rivera are also
20 charged with possession with intent to deliver
21 heroin. There was also heroin at 1908 Lancaster
22 Avenue.
23     There is, also, Mr. Ortiz is charged with

Page 92

1  use of a vehicle for keeping controlled substances.
2  I want to tell you a little bit about the law with
3  regard to that. It's called use of a vehicle for
4  keeping controlled substances. The statute calls it
5  maintaining a vehicle for keeping controlled
6  substances. But in any event, the point is that it
7  is not whether you buy the gas, you know, pay the car
8  bill, whatever, when you use a vehicle for keeping
9  controlled substances. And the same is also true of
10 a house. The statute is the same -- and we're going
11 to get to that in a minute -- or use of a dwelling
12 for keeping controlled substances. It's not whether
13 you pay the rent, it's not whether, you know, you fix
14 the faucets when they break. It's whether or not you
15 use it and use all of the constitutional protections
16 that everybody has with regard to not having their
17 privacy invaded, not being subject to unlawful
18 searches and seizures. When you use that vehicle or
19 that car or that dwelling for that specific purpose,
20 then you are guilty of use of a vehicle or use of a
21 dwelling.
22     And in this case, it's the 1989 BMW,
23 which the defendant Ortiz and Miss Ayala were in when

Page 93

1 they were stopped by the police which had the cocaine
2 in Miss Ayala's sweater pocket on that particular
3 occasion when we -- when they were leaving 1908
4 Lancaster Avenue.
5          There is also a charge of use of a
6 dwelling for keeping controlled substances, and that
7 is also -- that is 1908 Lancaster Avenue, and that's
8 Danielle Farmer and Nemensio Rivera. And there's
9 also a use of a dwelling for keeping controlled
10 substances, and that's Mr. Ortiz' charged with that,
11 and that's the 1933 West Fourth Street apartment
12 building.
13          Now, there is also a charge of conspiracy
14 in the second degree. And it charges Danielle
15 Farmer, Isaias Ortiz, and Nemensio Rivera, that they
16 agreed with each other to engage in possession with
17 intent to deliver cocaine.
18          Under Delaware law -- and I want to make
19 sure that you pay attention to this. Under Delaware
20 law, there is a section of the code which is
21 conspiracy. And under Delaware law, you can sit
22 around with people all day long and agree to commit
23 offenses, and that -- all kind of crimes. And unless

Page 94

1 you do something, or the person you're agreeing with
2 does something in furtherance of that conspiracy or
3 that agreement to commit a crime, then you have
4 committed no offense. But once you do something,
5 then you are guilty of the offenses for which you
6 have conspired to agree to. And that's true whether
7 or not you actually commit the offenses that you
8 agree to commit. And, so, in this particular
9 instance, Danielle Farmer, Isaias Ortiz, and Nemensio
10 Rivera, when they agreed to possess and agreed to
11 deliver cocaine and they actually had the cocaine,
12 then they are guilty of conspiracy in the second
13 degree.
14          Now, there is a part, it's related to
15 conspiracy in the second degree although it's not
16 exactly the same thing. There's another part of the
17 Delaware law that I want you to pay attention to with
18 regard to particular offenses, and that's what's
19 called accomplice liability, or aiding and abetting.
20 And what that means is that, if -- if you help
21 somebody else commit an offense, then whether or not
22 you actually did the offense or not, you are guilty
23 of committing the offense. And the most, you know,

Page 95

1 most sort of clear-cut example is in the instance of
2 a getaway driver, where, you know, two people agree
3 to rob a bank, and one person stays outside with the
4 car, while the other person goes into the bank and
5 pulls out the gun and robs -- takes the money from
6 the bank and then runs back outside and jumps in the
7 car and the getaway driver speeds him away. Well,
8 they have -- they have agreed, they have conspired to
9 commit the bank robbery, and one or both -- one of
10 them has committed an overt act -- actually, they
11 both have, an overt act in furtherance of the bank
12 robbery, and they're accomplices. They both -- you
13 know, the getaway driver has helped the guy who
14 actually went into the bank, so they are both guilty
15 of robbing the bank. Even though the getaway driver
16 never went into the bank, never had the gun, never
17 took any money, never did anything like that, he is
18 still an accomplice.
19          So, keep that in mind as you listen to
20 this, because you will notice that Mr. Ortiz isn't
21 actually in 1908 Lancaster Avenue and -- when the
22 police execute the warrant, but based on the
23 accomplice liability, the fact that he was there

Page 96

1 earlier, the fact that he went there for the purpose
2 of obtaining money and supplying drugs on this
3 particular occasion indicates that he is an
4 accomplice to the other two with regard to that
5 particular offense.
6          Now, the other thing that the defendant
7 is charged with is endangering the welfare of a child
8 by contributing to the delinquency of a child under
9 18 years of age.
10          Miss Ayala will tell you that she was --
11 it was her 16th birthday, she obviously remembers the
12 day. And she was -- and she knew she was in -- you
13 know, accompanying Mr. Ortiz who was, you know,
14 almost 28 years older than she was, while he was, you
15 know, delivering drugs, supplying drugs, doing those
16 kind of things. And in that way, he was contributing
17 to her delinquency with regard to these particular
18 offenses because that makes her a juvenile
19 delinquent.
20          And, then, with regard to possession of
21 drug paraphernalia, Danielle Farmer and Mr. Rivera
22 are charged with possession of drug paraphernalia,
23 the packing materials that I told you that were in

Page 97

1 1908 Lancaster Avenue, those -- those packing
2 materials are what is considered -- well, they're
3 used to pack, repack, store, contain or ingest into
4 the human body controlled substances. So, based on
5 that, those -- they possessed those particular
6 substances at 1908 Lancaster Avenue.
7        Those are the offenses. That's a brief
8 summary. You will hear much more detail from the
9 police officers. Especially in a case where the
10 facts are somewhat convoluted, it -- you don't want
11 to hear them all from me and then hear them all again
12 from the sworn witnesses. So, it's a summary of the
13 facts and a lot of the facts are omitted. And keep
14 that in mind.
15        But let me just tell you a little bit
16 about how this trial will proceed.
17        My name is Cynthia Kelsey. I'm a Deputy
18 Attorney General and I am here on behalf of the
19 people of the State of Delaware. And assisting me
20 today is Renee Hrivnak, and she was seated -- she was
21 here when you were selected as the jury, and she's
22 seated at the table where I was just sitting. And
23 with Miss Hrivnak and I is Detective Michael

Page 98

1 Rodriguez from the Wilmington Police Department.
2 He's a detective, and he's an undercover detective,
3 so that's sort of why he's dressed the way he's
4 dressed. And he's what's called the chief
5 investigating officer, so he gets to sit in
6 throughout the whole trial.
7        Now, in every criminal case, the State
8 has the burden of proof. The State has to prove the
9 defendant guilty beyond a reasonable doubt, and the
10 defendant doesn't have to prove anything. So, the
11 State always gets to go first. The State gets to
12 give their opening arguments first and, then, the
13 defendants can give their opening arguments if they
14 so choose. And, then, the State will present
15 evidence, and the State has to present enough
16 evidence to prove the defendants guilty beyond a
17 reasonable doubt. Then, the defendants, they can
18 give their opening, if they haven't already done so.
19 They have a choice to do it either before the State's
20 evidence or after the State's evidence. But, then,
21 they can present evidence, if they so choose. They
22 don't have to present any evidence because they don't
23 have to prove anything. The State has to prove that

Page 99

1 they're guilty beyond a reasonable doubt. Then, if
2 the defendants decide to present evidence, the State
3 can present what's called rebuttal evidence. We can
4 sort of -- if we want or need, feel like we need to
5 say something about what they said. And, then, there
6 will be closing arguments. And the State gets to go
7 first and, you know, by now, you all know that's
8 because the State has the burden of proof. Then, the
9 defendants get to give their closing arguments. And,
10 then, the State gets to give a rebuttal closing
11 argument. The State gets to go twice because the
12 State has the burden of proof. Then,
13 Judge Toliver -- and he's easy to spot, he's on the
14 bench -- will instruct you on the law which you must
15 apply to the facts in this case. You, as jurors,
16 don't get to or don't have to -- I guess it depends
17 on how you look at it -- decide what you think the
18 law should be. Judge Toliver will tell you what the
19 law is, and you have to listen to what Judge Toliver
20 says. You don't have to listen to what I say, you
21 don't have to listen to what the defense attorney
22 said, but you have to listen to what Judge Toliver
23 says. He will tell you what the law is. And, then,

Page 100

1 you, the jury -- he'll do that after all the closing
2 arguments are done. Then, you, the jury, will retire
3 to the jury room to deliberate, and you, the jury,
4 will decide what you think the facts are.
5        You have to decide what the facts are.
6 Judge Toliver can't tell you what the facts are. You
7 have to decide who you believe, you know, whether or
8 not there was enough evidence for this fact to be
9 true, whether or not there was enough evidence for
10 that fact to be true. You have to decide what the
11 facts are. And once you decide what the facts are,
12 then you have to apply the law that Judge Toliver has
13 given you to the facts as you believe them to be,
14 based on the evidence that's been presented and, in
15 that way, you render a fair and impartial verdict
16 based on the evidence and the law. And then you come
17 back into the courtroom and you tell the Court what
18 your verdict is based on the evidence and the law.
19        Now, the only other thing that you need
20 to be careful of is, the State has to prove each
21 defendant guilty beyond a reasonable doubt. Just
22 because one of the defendants is guilty doesn't mean
23 that there was enough facts to prove the other

Page 101

1 defendant guilty. So, you have to decide separate
2 verdicts based on separate evidence for each of the
3 defendants. And I wanted to point that out to you.
4 But based on the evidence that will be presented and
5 the law that Judge Toliver will give you, your
6 verdicts in this case will be guilty.
7 I thank you for your time and attention
8 throughout this trial. And I apologize in advance
9 for the inevitable delays, which I'm afraid you have
10 already gotten a healthy dose of, that are caused on
11 behalf of the State. Thank you.
12 MR. FIGLIOLA: Good afternoon, ladies and
13 gentlemen. Miss Kelsey may have introduced me. I'm
14 Anthony Figliola. I represent Mr. Ortiz.
15 Much of what Miss Kelsey said to you, we
16 can't attack. Only, generally, when we get up here,
17 we can tell you what you're supposed to do and what
18 you're not listening to, but Miss Kelsey's opening
19 statement encompassed some of the things that I would
20 normally say; that is, the burden of proof is on the
21 State. Miss Kelsey got up in front of you and she
22 recited what she believes, what the State believes
23 are the facts. At this point in time, that's all it

Page 102

1 is. That's what the State believes the facts are.
2 The facts are what you determine them to be.
3 Later on in the trial, the judge will
4 give what they call jury instructions. The jury
5 instructions will tell you the law that is to be
6 followed when you are determining guilt and
7 innocence. What the judge tells you is the law --
8 not what the attorneys tell you in either their
9 opening or closing arguments. What Miss Kelsey told
10 you when she said the burden of proof is on the
11 State, it is always on the State. What she told you
12 is not fact. The State has to prove it.
13 There are other things the State has to
14 prove, like did the defendants know, particularly
15 Mr. Ortiz, did he know there were drugs at 1933 West
16 Fourth Street? The elements says "knowingly
17 possess." That means you have to know that there
18 were drugs there. The mere fact that there were
19 drugs there and he had a key to that house does not
20 mean he knows that drugs are in that house. It
21 wasn't his house. The drugs that were found in the
22 car were not found on him. They were found on
23 someone else. That's the State's case. That's why

Page 103

1 they say you have to listen to everything, because
2 it's not clear-cut, it's not clear-cut as to who knew
3 who owned what?
4 You're going to hear from various
5 witnesses. Pay attention to what each and every one
6 says. They were indicted with Miss Farmer and
7 Miss -- and one of their, Mr. Amaro, I believe. That
8 has no bearing on this case unless Miss Farmer or
9 Mr. Amaro determine to come forward and testify. You
10 have to remember that. The State made mention about
11 what they may have been doing. It doesn't matter.
12 That's not to be considered by you unless they come
13 forward and testify.
14 The State also does something in their
15 opening that I always comment on because it
16 personally aggravates me. Miss Kelsey gets up there
17 and she says that she represents the people of the
18 State of Delaware. That's not right. She does not
19 represent the people of the State of Delaware. She
20 may represent the State of Delaware, but she
21 certainly does not represent the people, because
22 she's not representing me, she's not representing
23 Mr. Rivera, or Mr. Ortiz or Mr. Rivera. She's

Page 104

1 certainly not representing Mr. Toliver. And if she's
2 representing any one of the 14 people in that jury
3 box, you ought to raise your hand right now and ask
4 to be excused from this jury. I mean it. You
5 shouldn't be sitting on the jury if you believe that.
6 That man is innocent until they prove every element
7 of that indictment. That is their duty. That's why
8 they get to talk to you twice. The burden of proof
9 is on the State, and it always is on the State. And
10 you have to start with the mind-set that that man is
11 innocent. And the State does not represent you.
12 And, again, if you believe that's true, let the judge
13 know.
14 Thank you.
15 THE COURT: First witness now?
16 MR. TEASE: Your Honor.
17 MS. KELSEY: I think Mr. Tease --
18 THE COURT: I'm sorry, Mr. Tease.
19 MR. TEASE: I was hiding back there.
20 Thank you, your Honor.
21 Ladies and gentlemen, good afternoon, and
22 thank you for waiting so long. To add to what the
23 other lawyers have said, keep in mind that as

Page 105

1 Mr. Figliola was saying, these defendants are cloaked
2 in a veil of innocence. We all are. As I stand
3 before you today, they have noted their opportunity
4 to tell their side of the story. An indictment has
5 been brought. This is the first time anyone's
6 deciding this case. So, please remember, they come
7 before you innocent.
8      State has promised to prove this case
9 beyond a reasonable doubt. Keep in mind that is the
10 highest standard of proof in the law. I think most
11 people are familiar with the civil standard which is
12 preponderance of the evidence. That's when, for
13 example, a car accident, somebody gets hurt in that
14 car accident, they're injured, they bring a civil
15 lawsuit, they have to prove by 50 percent or greater
16 that the person who caused that accident caused their
17 injury. If they're able to do 51 percent, that's
18 preponderance of the evidence.
19      Now, reasonable doubt is, again, the
20 highest standard of law, and it's much higher than
21 this 50 percent preponderance of evidence standard.
22 When you're reviewing the facts here, applying those
23 to the law, keep in mind that the State is held to

Page 106

1 this highest burden because these are very serious
2 criminal offenses that both of these defendants face.
3      As Mr. Figliola said, your obligation as
4 jurors is serious. And that obligation is to keep an
5 open mind throughout all of this, to put aside any
6 preconceived notions you may have about crimes, about
7 crimes in our society. Human nature will make it
8 difficult for you to do that, because I think we all
9 came into this courtroom with an idea about crime in
10 our society. But your oath as jurors is to try to
11 recognize those preconceived notions, try to
12 recognize where they came from, and put them aside
13 for these next three days as you hear the facts of
14 this case.
15      This is probably one of a hundred cases
16 Miss Kelsey and Miss Hrivnak are working on. They
17 are doing their job, I'm doing my job, Mr. Figliola
18 is doing his. But for my client, this is the most
19 serious thing that has ever gone on in his life. And
20 keep this in mind. This is his time to present his
21 case and have the State prove their case beyond a
22 reasonable doubt.
23      Again, keep in mind your duty here. It's

Page 107

1 not to convict. It's to hear evidence. It's to see
2 if that evidence meets proof beyond a reasonable
3 doubt. I will submit to you that, after hearing this
4 over the next few days, you will see tremendous holes
5 in the State's case with respect to my client's case,
6 Mr. Rivera. He was present in a crack house. They
7 executed a warrant, you know, they found drugs in
8 that house. It's not his house. He just happened to
9 be there. He's not in possession of those drugs. At
10 the end of the case, you're going to say, I am
11 confident that we do have reasonable doubt about
12 that. We cannot say that Mr. Rivera possessed any of
13 these drugs.
14      So, again, bear with us for these days,
15 and thank you for your time. And, again, I think, at
16 the end of the case, you'll return a verdict of not
17 guilty for my client.
18      Thank you.
19      MR. FIGLIOLA: Your Honor, can we
20 approach sidebar.
21      THE COURT: Yeah.
22      (The following discussion took place at
23           sidebar):

Page 108

1      MR. FIGLIOLA: Your Honor, I just wanted
2 to point out that, during my opening when I remarked
3 that if anyone felt that Miss Kelsey represented --
4 any of the jurors felt Miss Kelsey represented them,
5 that they should raise their hand. Juror No. 5,
6 who's actually sitting in Juror seat No. 7 raised his
7 hand. I would ask that he be excused.
8      THE COURT: Well, I think we have to
9 figure out what he meant because --
10      MR. FIGLIOLA: We could ask him first.
11      THE COURT: But I mean, if he's saying
12 that she represents the State and he's a part of the
13 State, if he may have meant that, I'm not sure what
14 you have to say about that.
15      MS. KELSEY: His tax dollars pay me.
16      MR. FIGLIOLA: Did you see him raise his
17 hand? I saw him.
18      MS. KELSEY: No.
19      MR. FIGLIOLA: I saw him raise his hand.
20      THE COURT: Let me ask -- well, that's
21 Mr. Lee, I think it is.
22      MR. FIGLIOLA: Yes, Mr. Lee.
23      THE COURT: All right. I'll --

Page 109

1  MR. FIGLIOLA: I'm sorry. I'm not going
2  to say that.
3  THE COURT: All right. Let us send them
4  out. We may not get started until tomorrow anyway, I
5  know.
6  MS. KELSEY: I don't know -- I'd like to
7  finish with her.
8  THE COURT: I'd like to hear her
9  testimony, too. All right. Mr. Kilgore, would you
10  take the jury out and leave Mr. Lee in.
11  MR. FIGLIOLA: I said I do that all the
12  time. It's the first time anybody raised their hand.
13  MS. KELSEY: I didn't see him do it.
14  THE COURT: I thought it was a bit much.
15  MS. KELSEY: I knew I could bait you into
16  saying that.
17  MR. FIGLIOLA: You did.
18  MS. KELSEY: Because you did it.
19  MR. FIGLIOLA: I did it in the other one,
20  too.
21  (Jury leaves courtroom at 3:43 P.M.)
22  (Juror Lee remains in courtroom.)
23  THE COURT: You can remain seated. It's

Page 110

1  okay.
2  When Mr. Figliola, in the gray suit, was
3  making his opening statement, he asked if anyone here
4  thought that they were represented by Miss Kelsey.
5  Did you raise your hand?
6  JUROR: No, I didn't. I did -- started
7  to but I didn't actually put it up.
8  THE COURT: Okay. You said you started
9  to. Why? I'm just curious.
10  JUROR: Because I disagreed with him.
11  THE COURT: That she didn't represent
12  you?
13  JUROR: No, she represents the people of
14  the State.
15  THE COURT: Okay. All right. That's
16  fine. That's all I wanted to know. You don't
17  discuss what I just asked you. I just wanted to
18  know, clarify something. Okay?
19  He's going to take you out for a minute
20  and then we'll bring everybody back in.
21  (Juror Lee leaves courtroom at 3:45 P.M.)
22  THE COURT: Mr. Figliola, I mean, his
23  explanation was simple and straightforward. He feels

Page 111

1  the State represents the people. And, in theory,
2  that's probably the case.
3  MR. FIGLIOLA: Well, your Honor, the
4  reason I make that, I think if a juror starts off
5  with the belief that Miss Kelsey is representing
6  them, that's their standing -- my position is they're
7  starting on the wrong foot. They cannot feel that
8  Miss Kelsey is representing them. They have to be
9  totally unbiased in order to give the defendant a
10  fair trial.
11  THE COURT: Well, he said he disagreed
12  with your proposition that Miss Kelsey was -- and he
13  said she thought she was representing the State.
14  MR. FIGLIOLA: Correct.
15  THE COURT: So, but she is.
16  MR. FIGLIOLA: No, she is representing
17  the State. But she's not representing the people of
18  the State. If she's representing the people of the
19  State, she's representing you and me, the Court
20  clerks, and the defendants.
21  THE COURT: And, in theory, that's true.
22  MR. FIGLIOLA: Well --
23  THE COURT: This is kind of like the time

Page 112

1  I was talking to jurors because they might listen to
2  me. I mean, I say obviously, euphemistically, but I
3  can't -- if your motion is to strike him, I'm not
4  going to strike somebody because you raise -- I'm not
5  even somehow sure how it was relevant, unless you
6  were trying to get to bias. But we had voir dire.
7  He didn't indicate any bias one way or the other.
8  And he just simply thought -- which, I mean, it's
9  nice, but, I mean, I guess I was waiting for somebody
10  to say, "Well, yes, she does," because I'm thinking
11  yes, she does represent me and all the citizens and
12  the defendants and the Corrections' officers and the
13  police officers. And if you feel that someone feels
14  that she represents -- he said he didn't, said she --
15  he didn't say she represented him, represented all
16  the citizens of the state.
17  And on that basis, I'm not going to
18  disqualify him from serving as a juror because he
19  feels the State represents the people. If they watch
20  Law and Order, they're going to hear that. I mean,
21  that's what you hear on television all the time. I'm
22  not saying, because you hear it on television, it
23  means anything. I'm just saying, if you're

Page 113

1 indicating that he -- and he said he started to raise
2 his hand -- and maybe I went a little further than I
3 should have. He said, "No, I didn't, but I disagree,
4 she does represent the State or the citizens of the
5 state."
6     I understand your argument. I --
7 admittedly, it's novel because I've not heard it
8 before. But I think you'd have to ask, do you
9 presume that because she represents the State and the
10 State brings a charge, he is guilty, or they are
11 guilty? Now, if that's what you wanted to ask -- or
12 does that cause you to treat him differently or have
13 some bias against him, that's a different situation.
14     MR. FIGLIOLA: He was asked the bias
15 question, your Honor. It's the way it was put to him
16 by the State, had not been put to him in voir dire.
17 For example, if the voir dire had said the State is
18 represented by -- the people of the State of Delaware
19 are represented by Miss Kelsey, would that cause you
20 to believe that the defendant is probably guilty, or
21 something like that, that's -- that was not presented
22 in the voir dire, and it generally isn't. It was the
23 first time that I would say that that thought was put

Page 114

1 to the jury, was during her opening statement.
2     THE COURT: So, what do you want me to
3 do? Disqualify everybody?
4     MR. FIGLIOLA: He's the only one that
5 reacted to it, your Honor. The other 13 did not.
6     THE COURT: Well, I'll tell you what:
7 I'll bring him back and I'll ask him if the fact that
8 it may have been represented that Miss Kelsey
9 represented the people of the State of Delaware, does
10 that in any way cause him to prejudge whether either
11 defendant is guilty, or does that cause him to be
12 biased against either defendant for any reason, or
13 is -- and is he able to fairly and impartially judge
14 the facts of the case and resolve any disputes of
15 credibility or any dispute of fact without any bias
16 or prejudice?
17     MR. FIGLIOLA: That would be fine,
18 your Honor.
19     THE COURT: Okay.
20     MR. FIGLIOLA: If his answer is in the
21 negative, I guess it would be in the negative, then
22 he would be -- I would have no objection to him
23 remaining.

Page 115

1     THE COURT: Okay.
2     (Juror Lee enters courtroom.)
3     THE COURT: Mr. Lee, I apologize, but
4 something occurred that I forgot to ask you.
5 Sometimes I get forgetful, so you have to bear with
6 me.
7     All right. Let's assume for a moment
8 that it was represented to you, to all the members of
9 the jury, that Miss Kelsey, on behalf -- represented
10 all the citizens of the State of Delaware, okay?
11 This would include you, me, Corrections' officers,
12 the defendants, and everybody in the room. And let's
13 assume you accepted that proposition, that she did,
14 indeed, represent the citizens of the state.
15     Would that cause you to be biased
16 against -- biased or prejudiced against the
17 defendants and in favor of the State?
18     JUROR: Absolutely not.
19     THE COURT: Would it cause you to treat
20 either defendant differently because someone said
21 that -- or because -- or if you agreed that she
22 represented that all the citizens of the State,
23 including the defendants and the Corrections'

Page 116

1 officers and me, would it cause you to treat either
2 defendant differently than you would if you didn't
3 accept that proposition? In other words, if you
4 assumed for present purposes that Miss Kelsey
5 represents all the citizens of the State, would that
6 cause you to presume or to feel that the defendants
7 were probably guilty, probably did something, or in
8 any way changed the burden of proof in this case?
9     JUROR: No, no, I wouldn't assume that
10 they were guilty.
11     THE COURT: Would you be able to follow,
12 if I instruct you -- and I do -- that any defendant
13 charged with a crime in this Court is presumed
14 innocent until the State proves otherwise beyond a
15 reasonable doubt?
16     JUROR: Absolutely.
17     THE COURT: Would a belief that
18 Miss Kelsey represents the citizens of the State, all
19 the citizens of the State, in any way impede or
20 impair your ability to give fair and due
21 consideration to the facts of this case?
22     JUROR: It would not.
23     THE COURT: Okay. Would it impact upon

Page 117

1 your ability to participate as a juror in any way you
2 can think of?
3      JUROR: No.
4      THE COURT: Well, I thank you again,
5 Mr. Lee. And, again, I apologize for being
6 forgetful.
7      (Juror Lee leaves courtroom at 3:56 P.M.)
8      THE COURT: I can see the juror
9 evaluation form now. Judge needs, what is it called,
10 whatever that memory enhancer drug is. I did that
11 for obvious reasons. I didn't want him to be biased
12 against anybody or to either defendant. And if you
13 take something a little off the mark, that's okay.
14 If he thinks the, he can join my broadening fan club.
15      I went as far as I can go. I don't think
16 I can go any further, Mr. Figliola.
17      MR. FIGLIOLA: I understand, your Honor.
18 I'm satisfied.
19      MS. KELSEY: Your Honor, it is abundantly
20 clear that Mr. Lee is not going to be biased in this
21 case.
22      THE COURT: Well, I don't know. I just
23 didn't -- Mr. Figliola had a perfect right to raise

Page 118

1 it. And I just didn't want him to be upset with
2 either defense counsel or defense -- defendant.
3      All right. Bring them back in. Now,
4 Mr. Tease, do you join in anything?
5      MR. TEASE: I guess I join in that
6 objection, is probably the safe bet to me.
7      THE COURT: No problem.
8      MR. TEASE: Thank you, your Honor.
9      MS. KELSEY: Can I get Miss Ayala?
10      (Jury enters courtroom at 3:58 P.M.)
11      THE COURT: Ladies and gentlemen, thank
12 you for your patience. And at times you will not be
13 able to see me because this monitor is taller than I
14 am. But they didn't build these benches for those of
15 you who are vertically challenged.
16      All right, call your first witness,
17 ma'am.
18      MS. KELSEY: Thank you, Judge. State's
19 first witness is Solmari Ayala.
20      SOLMARI TORRES AYALA,
21 called as a witness, being duly sworn, was examined
22 and testified as follows:
23      DIRECT EXAMINATION

Page 119

1 BY MS. KELSEY:
2   Q  Miss Ayala, how old are you?
3   A  Sixteen, going on 17.
4   Q  When are you going to be 17?
5   A  In three weeks.
6   Q  In three weeks? Okay.
7      Now, you said -- you said your name was a
8 different last name. What did you say your last name
9 was?
10   A  Torres.
11   Q  Torres? On the night this happened, your
12 mom said your last name was Ayala. Which is it?
13   A  It goes Torres first and Ayala.
14   Q  So it's both?
15   A  Mm-hmm.
16   Q  Okay. If I call you Miss Ayala, that
17 won't upset you?
18   A  No.
19   Q  Okay. Now, and your mom was here earlier
20 with you today, wasn't she?
21   A  Yes.
22   Q  And she had to leave?
23   A  Mm-hmm.

Page 120

1   Q  So, you're still here? You have to
2 answer yes or no. You can't say mm-hmm. And this
3 lady has to take down everything you say. So you
4 have to enunciate distinctly.
5      Now, did you know a person by the name of
6 Isaias Ortiz?
7   A  Yes.
8   Q  Is he in the courtroom today?
9   A  Yes.
10   Q  And where is he seated? Can you point.
11 You have to --
12   A  On the right.
13   Q  On the right? Which person on the right?
14 In the front table or the back table?
15   A  Front table.
16   Q  And which side on the front table or the
17 back table?
18   A  The left side.
19   Q  Okay. The left side of the table or your
20 left? Is he the guy in the white shirt or --
21   A  Yes, in the white shirt.
22   Q  -- or the gray jacket. I guess they both
23 have white shirts on.

Page 121

1    A    The guy in the white.
2    Q    All right. And when did you meet him?
3    A    In a Spanish festival, September.
4    Q    Spanish festival, September?
5    A    Spanish festival last year.
6    Q    How old were you when you met him?
7    A    I was 15.
8    Q    Okay. And after you met him, did you
9    start spending time with him?
10   A    Yes.
11   Q    Okay. Where did you spend time with him?
12   A    At a house at Fourth and Union.
13   Q    Fourth and Union. Do you remember the
14   address?
15   A    No.
16   Q    Was it 1933 --
17   A    I guess.
18   Q    -- West Fourth Street?
19   A    Yes.
20   Q    And where was the apartment when you got
21   there to that building?
22   A    What is it?
23   Q    Where was the -- place -- was it a whole

Page 122

1    house, or did you stay in part of the house?
2    A    It was an apartment.
3    Q    An apartment. Do you know what the
4    number or the letter of the apartment was?
5    A    It was an apartment on the back.
6    Q    In the back?
7    A    Yeah.
8    Q    Okay. Did it have a number or letter?
9    A    I don't know.
10   Q    You don't know? Okay.
11        And did you have -- did you have a key to
12   that apartment?
13   A    Yes.
14   Q    Yes, you did?
15   A    Yes.
16   Q    Did you ever go there by yourself?
17   A    Yes.
18   Q    Yes? Okay. Now, do you remember
19   October 18?
20   A    Yes.
21   Q    Okay. And what do you remember -- what's
22   important about October 18 for you?
23   A    That's when I got locked up.

Page 123

1    Q    That's when you got locked up. Is that
2    also your birthday?
3    A    Yes.
4    Q    And how old were you last year?
5    A    I turned 16.
6    Q    You turned 16 on your birthday? And on
7    the day that you got locked up, did you see the
8    defendant? Did you see Mr. Ortiz?
9    A    Yes.
10   Q    Okay. Where did you see him? Where did
11   you first see him that day?
12   A    At Fourth and Union.
13   Q    At where?
14   A    Fourth and Union.
15   Q    And what's at Fourth and Union?
16   A    Hmm?
17   Q    What's at Fourth and Union?
18   A    The apartment.
19   Q    The apartment? Okay. And what time was
20   that?
21   A    I don't know.
22   Q    You don't know?
23   A    No.

Page 124

1    Q    Were you there and he showed up there, or
2    was he there and you showed up there? Or --
3    A    We met there.
4    Q    Did you talk to him on the phone and
5    agree to meet there?
6    A    Yes.
7    Q    Okay. And did you have anything or
8    anybody with you?
9    A    No.
10   Q    No? Now, did you have a puppy?
11   A    A puppy.
12   Q    Okay. Did you have the puppy with you
13   that day?
14   A    I was bringing the puppy from -- from
15   where you take the puppies when they're sick.
16   Q    Okay. And did you have the puppy at your
17   house and brought it to the apartment, or was the
18   puppy staying at the apartment?
19   A    No, I brought the puppy -- my mom dropped
20   me off right there and -- not exactly the house, but
21   the corner. But the puppy, she -- she was the one
22   that took me to the clinic, and she dropped me off at
23   the corner.

Page 125

1  Q  And you had the puppy with you?
2  A  With me.
3  Q  And what did you do with the puppy?
4  A  The puppy? I put it in the box.
5  Q  You put it in the box. Did you leave it
6 at the apartment?
7  A  Yes.
8  Q  And did you see the -- did you see
9 Mr. Ortiz then?
10  A  Yes.
11  Q  He was at the apartment?
12  A  Mm-hmm.
13  Q  Okay. And then what did you do?
14  A  I left to my mom's house.
15  Q  How long did you stay there?
16  A  Over my mom's?
17  Q  No. How long did you stay at the
18 apartment?
19  A  For a little bit.
20  Q  A little bit? Okay. And, then, where
21 did you go?
22  A  To my mother's.
23  Q  Okay. Did Mr. Ortiz come with you?

Page 126

1  A  No.
2  Q  No? And how long were you at your
3 mother's house?
4  A  Until, like, later on that night.
5  Q  Okay. Was that -- was this in the
6 morning when you fooled with the puppy, or was it in
7 the afternoon. It was in the afternoon when you --
8 was it two hours, six hours?
9  A  I was about my mom's house -- like, it
10 was around 4:00 when I brought the puppy back and
11 around 6:00 -- around 7:00.
12  Q  Around 7:00 when?
13  A  When he picked me up at my house.
14  Q  From your mother's house? Okay.
15  And when he picked you up -- do you know
16 what he was doing in that time period?
17  A  No.
18  Q  Okay. Did he tell you where he was going
19 or what he was doing?
20  A  Mm-mmm, no.
21  Q  No? Okay. When he picked you up, how
22 did he know to come by your mom's house and pick you
23 up?

Page 127

1  A  Because I call him.
2  Q  You called him on --
3  A  His cell.
4  Q  His cell phone. He had a cell phone?
5  A  Yes.
6  Q  And how long after you called him did it
7 take him to come pick you up?
8  A  Like, five minutes.
9  Q  Five minutes? And where did you go
10 when -- once he picked you up?
11  A  Some house in Lancaster.
12  Q  Some house on Lancaster Avenue?
13  Now, did you -- when you left the
14 apartment where you left the puppy, was he there when
15 you left?
16  A  Who?
17  Q  The defendant, Mr. Ortiz.
18  A  I can't remember.
19  Q  Okay, that's all right.
20  But he came and picked you up and went to
21 a house on Lancaster Avenue?
22  A  Yes.
23  Q  Okay. And what did you call the house on

Page 128

1 Lancaster Avenue?
2  A  Crackhead house.
3  Q  The crackhead house? Why did you call it
4 that? You have to answer. Can you tell --
5  A  I don't know.
6  Q  You don't know? But that's what you
7 called it?
8  Is that a name you made up or is that a
9 name he told you?
10  A  I just made it up.
11  Q  You just made it up. Okay.
12  When you went there, you went to that
13 house, was that a whole house or were there
14 apartments there?
15  A  It was apartments.
16  Q  Okay. Which apartment did you go to?
17  A  The first apartment.
18  Q  The first one? Okay.
19  And what did you -- did you knock on the
20 door, or did you just walk in, or what did you do?
21  A  We knocked.
22  Q  You knocked on the door? And did
23 somebody answer the door?

Page 129

1  A  Yes.
2  Q  And who answered the door?
3  A  I can't remember.
4  Q  You don't remember? Now, did you -- did
5  they let you come in?
6  A  Yes, when he came in.
7  Q  Okay. Did they recognize you?
8  A  Hmm?
9  Q  Did they recognize you, the person that
10  answered the door? I mean, did they say, you know,
11  open the door and say who are you, and you had to
12  tell them, or did -- did they open the door and say,
13  "Oh, Hi, come on in"?
14  A  They asked who it is, "Who is it?"
15  Q  Before they opened the door or after they
16  opened the door?
17  A  Before they opened the door.
18  Q  And did you tell them?
19  A  Yeah. It was me and Isaias.
20  Q  Okay. So, Mr. Ortiz, did he answer him,
21  or did you answer him?
22  A  He did.
23  Q  Okay. And he told his name?

Page 130

1  A  Mm-hmm.
2  Q  What name did he give him?
3  A  I don't know. He just said "It's me."
4  Q  "It's me"? Okay.
5  And, then, the person opened the door?
6  A  Yes.
7  Q  Okay. And where did you go once you got
8  in?
9  A  There was a lady.
10  Q  Do you know that lady's name?
11  A  No. And, then, there was the other girl
12  who named Danielle.
13  Q  There was a girl named Danielle?
14  A  Yes. She sitting in the living room, the
15  other girl.
16  Q  Those two women were in the living room?
17  A  Mm-hmm.
18  Q  Where -- was there chairs in the living
19  room or couch?
20  A  Sofas.
21  Q  Sofas? And where did you go?
22  A  To the dining room.
23  Q  To what?

Page 131

1  A  To the dining room.
2  Q  To the dining room? Okay. Is that one
3  big room, or are they separate rooms? Did you see?
4  A  It's almost together.
5  Q  They're almost together? Now, okay. And
6  who was in the dining room?
7  A  The guy right there.
8  Q  The guy in the courtroom?
9  A  Mm-hmm.
10  Q  What table is he seated at?
11  A  At the back table.
12  Q  At the back table. And where is he
13  seated at the back table?
14  A  In the middle.
15  Q  Okay, in the middle. What color shirt
16  does he have on?
17  A  White.
18  Q  Does he have on a jacket or anything?
19  A  No.
20  MS. KELSEY: Okay. Your Honor, I would
21  ask, first of all, that the record reflect that she
22  earlier identified Mr. Ortiz and she is now
23  identifying Mr. Rivera.

Page 132

1  THE COURT: Does he have anything on
2  other than clothes that you can see?
3  THE WITNESS: Something -- I don't know
4  what they call it.
5  MS. KELSEY: Is it on him?
6  THE WITNESS: On his head.
7  BY MS. KELSEY:
8  Q  Where on his head, what part of his head?
9  A  His ears.
10  THE COURT: Earphones, does it look like?
11  THE WITNESS: Yes.
12  THE COURT: The record should be so
13  noted.
14  BY MS. KELSEY:
15  Q  Okay. He was at the dining room table?
16  A  Yes.
17  Q  Anybody else?
18  A  No.
19  Q  You have to answer. I'm sorry. The
20  court reporter is going to shoot us both. You have
21  to answer the questions with "Yes" or "No."
22  A  No.
23  Q  How about Mr. Ortiz, did he bring

Page 133

1  anything with him?
2      A  No.
3      Q  Okay. Were the chairs around the table,
4  or were you standing up?
5      A  Standing up.
6      Q  Okay. Anybody put anything on the table?
7      A  Money.
8      Q  Money?
9      A  Mm-hmm.
10     Q  Who put that money on the table?
11     A  The guy in the back.
12     Q  Okay. Do you know a name for the guy in
13 the back? What did you call him?
14     A  Mr. Rivera in the back.
15     Q  Mr. Rivera is in the back? Did you have
16 a nickname for him?
17     A  Yes.
18     Q  What was the name?
19     A  My grandma call him Danny.
20     Q  Your grandma calls him Danny. How about
21 Mr. Ortiz, did you have a nickname for him?
22     A  Yes.
23     Q  And what was that?

Page 134

1      A  Freddy.
2      Q  Freddy? Okay.
3         So, it's Freddy, Danny, and you?
4      A  Mm-hmm.
5      Q  Was there anybody else there?
6      A  And the other two girls.
7      Q  And the other two girls who were in the
8  living room?
9      A  Mm-hmm.
10     Q  Were they paying any attention to you?
11     A  Yes.
12     Q  Are they part -- are they talking, too?
13     A  Yeah.
14     Q  So, all of you are talking?
15     A  Mm-hmm.
16     Q  Do you know how much money -- who did he
17 give the money too? Who did Mr. Rivera give the
18 money to.
19        MR. TEASE: Your Honor I'm going to
20 object to the form of the question. There's been no
21 evidence that money was given to Mr. Rivera. The
22 second part of the objection is that it sounds
23 leading to me.

Page 135

1         THE COURT: Rephrase the question.
2         MS. KELSEY: Okay.
3  BY MS. KELSEY:
4      Q  Was there money?
5      A  Yes.
6      Q  Where did it come from?
7      A  From Mr. Rivera.
8      Q  Okay. And where did it go?
9      A  To Isaia.
10     Q  To Mr. Ortiz?
11     A  Mm-hmm.
12     Q  And do you know how much money it was?
13     A  No.
14     Q  No? Do you know what it was for?
15     A  No.
16     Q  No? Now, did Mr. Ortiz have something
17 out?
18     A  What you mean?
19     Q  Did you see Mr. Ortiz put something
20 somewhere?
21        MR. FIGLIOLA: Objection, your Honor,
22 that's leading.
23        THE WITNESS: No, it was already in the

Page 136

1  house.
2         MS. KELSEY: When they object, you have
3  to wait until the judge rules on the objection.
4         THE COURT: Rephrase your question.
5         MS. KELSEY: Okay.
6  BY MS. KELSEY:
7      Q  Did you see Mr. Ortiz put something
8  somewhere?
9      A  No.
10     Q  You didn't see him --
11     A  Mm-mmm.
12     Q  -- put anything somewhere?
13     A  No. It was already in.
14     Q  What was already in?
15     A  The -- the coke was already in the
16 crackhead house.
17     Q  The coke was already in the crackhead
18 house?
19     A  Mm-hmm.
20     Q  How do you know that?
21     A  I don't know.
22     Q  You don't? Did you see some coke or
23 some --

Page 137

1    A  Yeah.
2    Q  Okay.  Who had it when you saw it?
3    A  It was just there.
4    Q  It was just sitting there?
5    A  Mm-hmm.
6    Q  Sitting where?
7    A  On the table.
8    Q  It was on the table?  So there was stuff
9  on the table?
10   A  What is it?
11   Q  When I asked you if there was anything on
12  the table --
13   A  The coke.
14   Q  -- you told me no.  But there was
15  something there?
16   A  The coke was just laying there.
17   Q  The coke was just laying there?  And when
18  you were talking, did anybody say anything about the
19  coke just laying there?
20   A  No.
21   Q  No?  Was it -- what did it look like?
22  What did the coke look like?
23   A  It was -- I don't know.

Page 138

1    Q  What color was it?
2    A  Like, brown.
3    Q  Was it in a bag, in a box, just sitting
4  on the table?
5    A  I can't remember.
6    Q  You can't remember.  How big was it?  How
7  many inches wide?
8    A  Like this.
9    Q  Okay.  And how in the other direction?
10  Show the jury so they can see.
11        The jury.  That's the judge.  This is the
12  jury.  How high?
13   A  It was like this and -- I really can't
14  remember.
15   Q  You don't remember?  Was it packed
16  together hard, like in a round shape?
17   A  Yes.
18   Q  How high -- how high up off the table was
19  it?
20   A  It was just a little -- like that.
21   Q  Now, and where did that go?  Did it just
22  stay on the table the whole time you were there?
23   A  No.

Page 139

1    Q  Where did it go?
2    A  In my jacket.
3    Q  In your jacket?  Okay.
4       Who put it in your jacket?
5    A  The guy back there.
6    Q  Who?
7    A  The one in the back.
8    Q  Mr. Rivera put it in your jacket?
9    A  Yes.
10   Q  Okay.  Did he say anything when he put it
11  in your jacket?
12   A  The other girl gave it to me.
13   Q  What other girl?
14   A  Danielle.
15   Q  She gave it to you?
16   A  Yeah.
17   Q  And did she say?
18   A  "You ought to take this."
19   Q  "You ought to take this"?
20   A  We had to take that.
21   Q  I didn't hear what you said.
22   A  She told us we had to take that.
23   Q  She told -- us meaning who?

Page 140

1    A  Me and Isaia.
2    Q  Okay.  That you had to take that?
3    A  That we had to, yeah.
4    Q  Did she say why?
5    A  Hmm?
6       MR. TEASE:  Judge, objection.  Can we
7  approach?
8       (The following discussion took place at
9         sidebar):
10       MR. TEASE:  Your Honor, my specific
11  objection there, I think we're talking about what
12  Miss Farmer said, and it doesn't just go to what they
13  did in reaction to what Farmer said or something,
14  it's, like, clearly hearsay.  And there's also been a
15  lot of questions, open-ended questions, what was said
16  at that time, where we could be getting to what one
17  of the defendants said.  So our position, the State's
18  got to be very careful.
19       THE COURT:  You don't object to the State
20  leading?
21       MS. KELSEY:  I'm not leading.  I'm
22  repeating her.
23       THE COURT:  What I'm saying is, Mr. Tease

Page 141

1  and Mr. Figliola wouldn't object if you have to lead
2  her. We're dealing with a 17-year-old, or almost
3  17-year-old with the mind of about a 13 or
4  14-year-old who doesn't know the difference between
5  the judge and the jury. Plus, she's trying,
6  obviously, to shade her testimony so it's helpful to
7  the defendants.
8        Now, I understand your objection and it's
9  well founded, but you're going to have to allow her
10 some leeway to lead this witness to escape the other
11 part. I agree with you, she may say anything.
12 Fortunately, she's not smart enough to know what to
13 say.
14        MR. TEASE: So, the onus, I think, is on
15 the State, your Honor.
16        THE COURT: But the State is going to
17 have to be able to lead somewhat to overcome your
18 objection. Do you agree to that, or what?
19        MR. TEASE: I think I have to, yes. I
20 know I don't have to, your Honor, but I think I do.
21        MR. FIGLIOLA: I was just going to ask,
22 is Farmer going to testify?
23        MS. KELSEY: Mm-mmm, not that I know of.

Page 142

1        MR. FIGLIOLA: Okay.
2        THE COURT: So, you have to allow her to
3  lead. Let's try to narrow the questions.
4        MS. KELSEY: Okay.
5        (Sidebar conference concluded.)
6  BY MS. KELSEY:
7     Q  Okay. Based on what Miss Farmer said,
8  did you put it in your jacket pocket, or did somebody
9  else put it in your jacket pocket?
10    A  She put it in there.
11    Q  She did?
12    A  Yeah, and gave me my jacket back, and I
13 took it.
14    Q  And you took it. And you knew what it
15 was?
16    A  Yes, I did.
17    Q  Okay. How did you know what it was?
18    A  Because I seen it.
19    Q  Because you saw it?
20    A  Yes.
21    Q  And you knew what that was?
22    A  Okay.
23    Q  Was it yours?

Page 143

1     A  No, it was not mine.
2     Q  Okay. Whose did you think it was?
3     A  Them.
4     Q  All -- them who?
5     A  It belonged from the crackhead house.
6     Q  Hmm?
7     A  It belonged to the crackhead house.
8     Q  And who did you think it was in the
9  crackhead house?
10    A  In the crackhead house? A whole bunch of
11 crackheads.
12    Q  Was there anybody that was there -- had
13 you ever been there before?
14    A  Yeah, that's where I got my puppy from.
15    Q  Okay. When you -- one time before?
16    A  Mm-hmm.
17    Q  Who was there when you were there before?
18       MR. TEASE: Objection, objection. Can we
19 approach, I guess?
20       (The following discussion took place at
21          sidebar):
22       THE COURT: Yes, Mr. Tease.
23       MR. TEASE: Your Honor, the question put

Page 144

1  to Miss Ayala was, "Have you been to the crackhead
2  house before?" and she said yes, once before. And,
3  then, the question, I think, was going to be, "Who
4  was there?" Now, we're getting into --
5        THE COURT: Prior bad acts.
6        MR. TEASE: -- prior bad acts. I'm
7  asking for some sort of a proffer.
8        MS. KELSEY: Just being there isn't a
9  prior bad act. Just being --
10       THE COURT: It depends upon who she's
11 going to say was there, if that's what you're going
12 to ask her.
13       MS. KELSEY: All right. Well, my point
14 is, she said one time she was there before, she got
15 the puppy. That's not a bad act.
16       THE COURT: Okay. But I'm saying, are
17 you going to ask who was there?
18       MS. KELSEY: When she got the puppy,
19 yeah.
20       THE COURT: Why --
21       MS. KELSEY: I think it shows -- it shows
22 that there were two people who lived there or stayed
23 there all the time, that being Mr. Rivera and

Page 145

1    Miss Farmer.

2          THE COURT: Well, let's do it this way.

3    She referred to it, as you called it, the crackhead

4    house, that was on Fourth Street or Lancaster Avenue?

5    It's the one on Lancaster Avenue. Why don't you ask

6    her, the house on Lancaster Avenue as opposed to the

7    Fourth Street property, you went there and that's

8    where you got your puppy. Who was there then? Let's

9    try to avoid crackhead house. It's cute but you

10   may --

11         MS. KELSEY: I didn't make it up.

12         THE COURT: -- cause problems all the way

13   around. I know, but you had her say it about six

14   times now. I think they get the point.

15         So, I sustain the objection. I direct

16   you to handle it in that fashion.

17         MS. KELSEY: Yes, your Honor.

18         THE COURT: Anybody have a problem with

19   that?

20         MR. FIGLIOLA: No, your Honor.

21         MR. TEASE: No, sir, your Honor.

22         (Sidebar conference concluded.)

23         THE COURT: Ladies and gentlemen, from

Page 146

1    time to time -- and I don't mean to be rude. But

2    from time to time, my secretary or bailiff will have

3    to come, either bring me something or get something,

4    matters probably sometimes related to this, sometimes

5    not, because the business is so jumping, goes on in a

6    lot of different matters at the same time. So, I

7    just wanted to assure you, believe it or not, I can

8    do what they call multitasking, I think. It's kind

9    of like being a parent, you can hear several

10   different sources of information at once. So, it's

11   all judicially Court related, and I just wanted to

12   make sure you -- I am, believe it or not, I've been

13   doing this for a while, I have a fair sense of what

14   I'm doing. I didn't want you to think that I was not

15   doing what I was supposed to do. I'm taking notes on

16   the computer. I'm not playing games or having any

17   phone conversation. I've had jurors ask me what I

18   was doing up there. I tell you up front.

19         All right, you may proceed, ma'am.

20         MS. KELSEY: Okay.

21   BY MS. KELSEY:

22   Q   The house -- the house you were at the

23   night you got arrested, were you there before?

Page 147

1    A   Yes.

2    Q   And when were you there before? When you

3    got the puppy?

4    A   Yes.

5    Q   Okay. And when you got the puppy, who

6    was there?

7    A   Mr. Rivera and Miss Farmer.

8    Q   And just those two?

9    A   Yes.

10   Q   Okay. When you got the puppy, did you go

11   by yourself, or did you go with Mr. Ortiz?

12   A   He told me -- I went by myself.

13   Q   You went by yourself? Okay.

14       Now, the house where you left the puppy

15   at 1433 or 1933 West Fourth Street, had you ever --

16   how long had you been going to that apartment?

17   A   Like, for a little less than two weeks

18   before I got arrested.

19       THE COURT: You have to speak up.

20       THE WITNESS: The last two weeks before I

21   got arrested.

22   BY MS. KELSEY:

23   Q   The two weeks before you got arrested.

Page 148

1    And how often would you go? How many times a day

2    would you go, or how many times a week, or whatever?

3    A   Maybe once or twice a day.

4    Q   Okay. And when you went there, was there

5    ever anyone else there other than Mr. Ortiz?

6    A   I used to have friends that used to live

7    downstairs from the house.

8    Q   Downstairs, is that a different house

9    or --

10   A   She used to go to school with me.

11   Q   She used to go to school with you.

12   A   The apartment on the bottom.

13   Q   The apartment -- was it a different

14   apartment or the same apartment, an upstairs and

15   downstairs or --

16   A   It was a different apartment. She live

17   downstairs.

18   Q   Okay. But other than in the apartment

19   where you went, was there ever anybody else there?

20   A   No.

21   Q   No? Okay.

22       MS. KELSEY: Could I have one minute,

23   your Honor?

Page 149

1    THE COURT: Yes.
2    MS. KELSEY: I have no further questions,
3    your Honor.
4    THE COURT: Mr. Figliola.
5    MR. FIGLIOLA: Thank you your Honor.
6    CROSS-EXAMINATION
7    BY MR. FIGLIOLA:
8    Q    Good afternoon, Miss Torres.
9    Miss Torres, what were you charged with?
10    A    Conspiracy, instead of delivery.
11    Q    And have those charges been taken care
12    of?
13    A    Yes. I'm on probation still.
14    Q    Okay. And when did that happen? When
15    did you go on probation?
16    A    It's been -- it's going to be a year now.
17    Q    Okay. Now, you said that you testified
18    that you saw Mr. Ortiz -- did you see him almost
19    every day for two weeks?
20    A    Sometimes. There were times I didn't see
21    him.
22    Q    Pardon?
23    A    There was times I didn't see him.

Page 150

1    Q    There were times you didn't see him?
2    Last year in October, were you going to
3    school?
4    A    No.
5    Q    No? What would you generally do all day?
6    A    Me?
7    Q    What would you do all day?
8    A    Nothing.
9    THE COURT: You have to speak up.
10    THE WITNESS: Nothing.
11    BY MR. FIGLIOLA:
12    Q    Nothing? Now, when you were arrested, do
13    you remember speaking with either Detective Drysdale
14    or Detective Rodriguez?
15    A    Detective Rodriguez.
16    Q    You spoke with Detective Rodriguez? Did
17    he give you your Miranda warnings?
18    A    What is that?
19    Q    Miranda warnings, he tells you you're
20    under arrest, you have the right to an attorney,
21    anything you say may or may not be used against you
22    in a Court of law.
23    A    Yeah, I think so.

Page 151

1    Q    He told you that?
2    A    Yeah.
3    Q    Okay. Now, when you were arrested, they
4    found a sweater in the back of the BMW; correct?
5    A    Mm-hmm.
6    Q    And the sweater had the cocaine in it?
7    A    That was my sweater.
8    Q    Do you remember telling Detective
9    Rodriguez that that was your sweater and your
10    cocaine?
11    A    Yes.
12    Q    Now, today, you said the cocaine belonged
13    to the people in the crackhead house.
14    A    Mm-hmm.
15    Q    Which was the true statement? Was it
16    your cocaine, or did it belong to the people in the
17    crackhead house?
18    A    It belonged to the people in the
19    crackhead house.
20    Q    Okay. When you were hanging around all
21    day doing nothing, you weren't selling drugs, were
22    you, Miss Torres?
23    A    No, I was waiting for DFS to put me in

Page 152

1    school.
2    Q    You were waiting for somebody to put you
3    in school?
4    A    DFS.
5    Q    Why weren't you in school?
6    A    Because I had a lot of problems in
7    school. I mean, I was in school but at that time, I
8    was not.
9    Q    How long had you been out of school?
10    A    Since last year.
11    Q    Since last year? Did you have a job?
12    A    Yeah.
13    Q    You did? Where did you go to work?
14    A    I used to help out at the Spanish
15    restaurant, Fourth and DuPont.
16    Q    Spanish restaurant?
17    A    Fourth and DuPont.
18    Q    Okay. What did you do there?
19    A    Help out some lady doing waitress. And I
20    was seven month pregnant. I started at a buffet.
21    Q    Okay. Now, the sweater that the drugs
22    were found in --
23    A    Mm-hmm.

Page 153

1  Q  -- did you also know there was money
2  found in that jacket?
3  A  Yes.
4  Q  That sweater?
5  A  Yes.
6  Q  Was that your money?
7  A  Yes.
8  Q  Okay. And how much was there?
9  A  Almost 400.
10  Q  Where did that come from?
11  A  My mother, Isaia gave it to me for my
12  birthday.
13  Q  Your mother gave it to you for your
14  birthday?
15  A  My mother and Isaia.
16  Q  When did they give it to you? That day?
17  A  Yeah, when I got out of my house.
18  Q  What time was that?
19  A  I don't know.
20  Q  You don't know?
21  A  No.
22  Q  Now, you said you had -- you had a key to
23  the apartment on West Fourth Street?

Page 154

1  A  Yes.
2  Q  How long did you have that key?
3  A  Like three days.
4  Q  Three days, you never had it before that?
5  A  No.
6  Q  Who did you get the key from?
7  A  From the girl, from the people from
8  downstairs.
9  Q  So, the people that -- the people that
10  lived downstairs had a key to the back apartment?
11  A  Yes.
12  Q  And what was the name of the people
13  downstairs?
14  A  I only know her by Su-Lee (PH.).
15  Q  And, so, you got the key from the people
16  downstairs and got into the back apartment where you
17  used to see Mr. Ortiz?
18  A  Mm-hmm.
19  Q  Okay. And you left your dog there?
20  A  Yeah.
21  Q  Okay. When did you see your dog again?
22  A  Never again.
23  Q  Never saw your dog again? Now, when you

Page 155

1  left the dog at the apartment, you say you don't
2  remember if Mr. Ortiz was there?
3  A  What you mean?
4  Q  When you brought your dog to West Fourth
5  Street --
6  A  Mm-hmm.
7  Q  -- and left the dog there, was Mr. Ortiz
8  there when you left the dog?
9  A  Yes. That's where we met.
10  Q  I thought you said Mr. Ortiz, you called
11  him on the cell phone and he picked you up at your
12  mother's.
13  A  No. I said first that he met me at the
14  apartment. Then I left to my mother's by myself.
15  Q  Okay. Did Mr. Ortiz have clothes in the
16  apartment, do you know?
17  A  No. Only some clothes he bought me.
18  Q  Clothes he brought you? Did you ever see
19  any drugs in that apartment?
20  A  No.
21  Q  No? When Mr. Ortiz picked you up, what
22  car was he in?
23  A  BMW.

Page 156

1  Q  Okay. Was that his car, do you know?
2  A  Yes.
3  Q  Had he always picked you up in that BMW?
4  A  Mm-hmm.
5  Q  Did you ever see him in any other car?
6  A  A red car.
7  Q  Pardon?
8  A  A red car.
9  Q  I can't understand you.
10  A  Some red car.
11  Q  Some red car, okay.
12  Did Mr. Ortiz live somewhere else? By
13  that I mean, I'm not talking about West Fourth
14  Street. Do you know if Mr. Ortiz lived somewhere
15  else?
16  A  Yes.
17  Q  He did? Who did he live there with?
18  A  His wife.
19  Q  And where did they live?
20  A  Monroe.
21  Q  On Monroe Street? Had you ever been to
22  that house?
23  A  No.

Page 157

1   Q   Were you inside the car when the police
2 stopped you --
3     A   Yes.
4     Q   -- with Mr. -- with Mr. Ortiz?
5     A   Mm-hmm.
6     Q   Okay. Had you started to drive away or
7 anything?
8     A   We were just pulling out of the parking.
9     Q   Okay. Do you remember telling the
10 police -- did you give your -- the police your real
11 name?
12     A   No.
13     Q   Okay. Do you remember what name you gave
14 them?
15     A   Maria.
16     Q   Okay.
17     A   I told them I was 22.
18     Q   Did you call your mother when you got to
19 the police station?
20     A   No.
21     Q   Do you know how your mother got to the
22 police station?
23     A   She found out by somebody seen me get

Page 158

1 arrested.
2     MR. FIGLIOLA: May I have a second,
3 your Honor.
4     THE COURT: Mm-hmm.
5     (Mr. Figliola conferring with Mr. Ortiz.)
6 BY MR. FIGLIOLA:
7     Q   The Lancaster Avenue apartment, other
8 than the evening you left there and the police
9 stopped you, other than that one time, had you ever
10 been in that apartment other than to pick up your
11 dog?
12     A   No.
13     Q   No? You're positive of that?
14     A   Yes.
15     Q   Why would you refer to it as the
16 crackhead house if you had never been there before?
17     A   Because of the crackhead house, both
18 times I went, there were just crackheads coming and
19 going.
20     Q   Coming and going, a lot of people?
21     A   Mm-hmm.
22     MR. FIGLIOLA: Nothing further.
23     CROSS-EXAMINATION

Page 159

1 BY MR. TEASE:
2     Q   How are you, Miss Ayala?
3     A   Fine.
4     Q   Okay. Miss Ayala, when you were
5 testifying in response to Miss Kelsey's questions,
6 you indicated that, when you went to the apartments
7 on Lancaster Avenue, or the apartment, you knocked on
8 the door; correct?
9     A   Yes.
10     Q   I guess it was actually Mr. Ortiz knocked
11 on the door?
12     A   Yes.
13     Q   Somebody asked, "Who is it?"
14     A   Mm-hmm.
15     Q   Right. Mr. Ortiz identified himself or
16 identified the both of you?
17     A   He said it was me.
18     Q   And you're not sure who that person was,
19 correct, who was answering the door?
20     A   It was Nemensio Rivera.
21     Q   Okay. You didn't say that on -- when you
22 were asked first. You said you didn't know who it
23 was. Are you changing your testimony now?

Page 160

1     A   No.
2     Q   Okay. Do you remember when you were
3 asked the first time, you said you didn't know who
4 answered the door?
5     A   I don't know.
6     Q   I'm sorry?
7     A   I don't know.
8     Q   You don't know? Do you remember, the
9 first time when you testified, that you said you
10 didn't know who answered the door?
11     A   I don't remember saying that.
12     Q   Okay. Okay. And, then, I think your
13 testimony was you go into the apartment with
14 Mr. Ortiz, and you described the living room and the
15 dining room; right?
16     A   Mm-hmm.
17     Q   Okay.
18     THE COURT: Ma'am, you have to answer yes
19 or no.
20     THE WITNESS: Yes.
21 BY MR. TEASE:
22     Q   Are these rooms that are next to each
23 other?

Page 161

1   A  Yes.
2   Q  Is there also a kitchen area?
3   A  It's all together.
4   Q  Okay. Is the kitchen sort of part of the
5  living room, or part of the dining room, or is it a
6  separate room?
7   A  It's like -- it's not all together,
8  because they got the living room, then it got the
9  kitchen back there and the dining room. It's
10 together, the dining room and the kitchen.
11  Q  Okay. Do you know if there are bedrooms
12 in this apartment?
13  A  Hmm?
14  Q  Are there bedrooms in this apartment?
15  A  I don't know.
16  Q  Is there an upstairs to this apartment?
17  A  The apartment upstairs?
18  Q  No. My question is, in this apartment
19 that you were in, is there -- is there an upstairs to
20 this apartment, or is it just one floor?
21  A  One floor.
22  Q  Okay. There was a hallway leading away
23 from these rooms that could have gone back to

Page 162

1  bedrooms?
2   A  I don't know.
3   Q  Okay. Did you see any beds in any of
4  these rooms?
5   A  No.
6   Q  Okay. Okay. And when you went in, you
7  saw -- you said there was a lady there and there was
8  also a girl there named Danielle; correct?
9   A  Mm-hmm.
10  Q  Okay. Now, you testified twice that it
11 was Danielle that put drugs in your jacket; is that
12 right?
13  A  Yes.
14  Q  And you're certain about that?
15  A  Yes.
16  Q  Okay. And you also told Mr. Figliola,
17 the gentleman sitting over here, that this was what
18 you called a crack house?
19  A  Yes.
20  Q  Okay. That there were people in and out
21 of this apartment during --
22  A  Yes.
23  Q  I'm sorry, let me finish my question.

Page 163

1         During the two times that you were there,
2  you saw people in and out of this apartment?
3   A  Yes.
4   Q  And you also indicated that you saw
5  Mr. Rivera putting money on the table?
6   A  Yes.
7   Q  Okay. You have no idea how much money
8  that was?
9   A  No.
10  Q  Okay. Did you see what happened to that
11 money?
12  A  It went to Isaia.
13  Q  I'm sorry? You're saying that it went to
14 Mr. Ortiz?
15  A  Mm-hmm.
16  Q  He picked that money up?
17  A  Mm-hmm.
18  Q  Now, when you're saying that Miss Farmer
19 put the drugs in your pocket, where did she get drugs
20 from? Do you have any idea?
21  A  On the table.
22  Q  Okay. What table?
23  A  The dining room table.

Page 164

1   Q  Dining room table. She walked over,
2  picked up the drugs, stuffed them in your pocket?
3   A  Yeah.
4         MR. TEASE: Your Honor, can I just have a
5  moment with my client? Thank you.
6         Thank you, your Honor. Miss Ayala, I
7  have nothing further. Thank you.
8         THE COURT: Miss Kelsey, redirect?
9            REDIRECT EXAMINATION
10 BY MS. KELSEY:
11  Q  You had almost $400 on you when you got
12 arrested?
13  A  Yes.
14  Q  And you said your mother and Mr. Ortiz
15 gave you that money?
16  A  Mm-hmm.
17  Q  And how much did your mother give you?
18  A  My mother? She gave me a hundred
19 dollars.
20  Q  And the rest of the money, who gave you
21 that?
22  A  Isaia.
23  Q  Mr. Ortiz gave you the rest? And when

Page 165

1  had he given it to you?

2    A  I think the day before.

3    Q  Okay.

4        THE COURT: You have to speak up, ma'am.

5        MS. KELSEY: The judge couldn't hear you.

6  Could you say that again.

7        THE WITNESS: The day before.

8  BY MS. KELSEY:

9    Q  The day before? Are you sure of that?

10   A  Yes.

11   Q  Okay. Now, you said you were working at

12 the Spanish restaurant?

13   A  Mm-hmm. Yes.

14   Q  And on the day that this happened, were

15 you working at the Spanish restaurant?

16   A  No, not that day.

17   Q  No? When were you working at the Spanish

18 restaurant?

19   A  The day before.

20   Q  The day before, you worked the Spanish

21 restaurant?

22   A  Mm-hmm.

23   Q  And you were seven months pregnant the

Page 166

1  day before?

2    A  No. I say I was working at the buffet

3  when I was seven months pregnant.

4    Q  You were working at the buffet when you

5  were seven months pregnant.

6    A  When I --

7    Q  When was that?

8    A  A couple months ago.

9    Q  Hmm?

10   A  In March, I think.

11   Q  In March? Okay. So, you weren't

12 pregnant, seven months pregnant when this happened?

13   A  Hmm?

14   Q  You weren't seven months pregnant when

15 this happened?

16   A  I was working until I was seven months.

17   Q  Okay. And that was at the buffet and the

18 Spanish restaurant?

19   A  No, that was a buffet by Concord Pike.

20   Q  Now, how often did you see Mr. Ortiz in

21 the month that you knew him?

22   A  In the month that -- like, every other

23 day.

Page 167

1    Q  I didn't hear you.

2    A  Like, every other day.

3    Q  Every other day? And was that in the

4  daytime, at night?

5    A  Daytime.

6    Q  In the daytime? Did he work?

7    A  Not that I know of.

8    Q  Not that you know of?

9        MR. FIGLIOLA: It's his watch,

10 your Honor.

11       THE COURT: Impressive. Take it off, do

12 something with it.

13       MR. ORTIZ: That's it.

14 BY MS. KELSEY:

15   Q  Who paid for the apartment, 1933 West

16 Fourth Street?

17   A  I guess Isaia.

18       MR. FIGLIOLA: Your Honor, I don't know

19 how she -- if she has personal knowledge, fine. But

20 she can't be guessing who pays for it.

21       THE COURT: If your objection is

22 foundation, ask her if she has any knowledge.

23 BY MS. KELSEY:

Page 168

1    Q  Did you pay for it?

2    A  No.

3    Q  Okay. Did you ever see Mr. Ortiz pay for

4  it?

5    A  No.

6    Q  So, you don't know who paid for it?

7  Okay.

8        Did you ever -- did Mr. Ortiz have -- did

9  you ever see him with any amount of cash other than

10 the $300 he gave you, almost $300 he gave you?

11   A  What was that again?

12   Q  Did you ever see Mr. Ortiz with any cash

13 other than the $300 he gave you?

14   A  Did I see him with money?

15   Q  Yes.

16   A  Yes.

17   Q  Like how much money?

18   A  About 300.

19       THE COURT: You have to speak up, ma'am.

20       THE WITNESS: Like 300, 400.

21 BY MS. KELSEY:

22   Q  Three hundred, 400?

23   A  I don't know. I didn't count his money.

Page 169

1   Q  You didn't count it? Okay.
2      Where was he coming from?
3   A  When?
4   Q  When he came to pick you up, where was he
5  coming from? Did he say?
6   A  No. I know that day, he was in New York,
7  seeing his daughters.
8   Q  He went to New York to see his daughters?
9   A  Mm-hmm.
10   Q  And how do you know that?
11   A  He told me.
12   Q.  Okay. Were the drugs that Danielle gave
13  you your drugs?
14   A  No.
15   Q  Whose were they?
16   A  The crackhead's house.
17   Q  They belonged to the house? Okay.
18      Why was she giving them to you?
19   A  So I could take it. She told us we got
20  to take it.
21   Q  Where were you going to put them?
22   A  I don't know.
23   Q  Were you going to use them?

Page 170

1   A  No. I don't use drugs.
2   Q  Well, were you going to keep them? Were
3  you going to throw them away? What were you going to
4  do with them?
5   A  I don't know. I was going to get dropped
6  off at some party.
7   Q  What?
8   A  I was going to get dropped off at a
9  friend's house to go to the party.
10   Q  You were going to get dropped off where?
11   A  After this, I was going to get dropped
12  off at a friend to go to party.
13   Q  Okay. And were you taking the drugs with
14  you?
15   A  No.
16   Q  What were you going to do with them?
17   A  I was not going to do nothing with them.
18   Q  Hmm?
19   A  I don't know. I wasn't going to do
20  nothing with them.
21   Q  Well, were you going to wear your jacket?
22   A  No.
23   Q  What were you going to do with it?

Page 171

1   A  Leave it in the car.
2   Q  Why?
3   A  Hmm?
4   Q  Why?
5   A  Because that's where it was.
6   Q  All right. Okay. Where was Mr. Ortiz
7  when Danielle handed you the drugs?
8   A  He was in the kitchen.
9   Q  Where was he?
10   A  Standing in the kitchen.
11   Q  Well, in the kitchen where you were, or
12  somewhere else? Were you still in the dining room?
13   A  What?
14   Q  Were you with him?
15   A  Yes.
16   Q  Okay. I mean, could he see him -- her do
17  that?
18   A  Yes.
19   Q  Okay. And how do you know that?
20   A  I don't know.
21   Q  Did Mr. Ortiz have a key to the
22  apartment?
23   A  Yes.

Page 172

1   Q  How do you know that?
2   A  Because -- I don't know.
3   Q  I didn't hear?
4   A  I don't know. My mom told me they find
5  the key on him.
6   Q  Did you ever see him with a key?
7   A  Hmm?
8   Q  Did you ever see him with a key?
9   A  Yes.
10   Q  Okay. When you left, did you lock the
11  door?
12   A  If I locked the door?
13   Q  When you left, did you lock the door?
14   A  No.
15   Q  No? Okay. Did you ever -- when you met
16  him there that day, was he already inside when you
17  got there?
18   A  No.
19   Q  No? How did you get in?
20   A  I had a key.
21   Q  You had a key? Did he have a key?
22   A  Yes.
23   Q  Okay. Well, who unlocked the door?

Page 173

1   A  What you mean?
2   Q  Who unlocked the door, you or him?
3   A  I did.
4   Q  You did.
5   A  But, then, I left to my mother's.
6   Q  But you saw his key?
7   A  Hmm?
8   Q  Did you see his key?
9   A  Yes.
10  Q  How did you know it was to that
11  apartment?
12  A. I don't know.
13      MS. KELSEY: I have no further questions.
14          RECROSS-EXAMINATION
15  BY MR. FIGLIOLA:
16  Q  Miss Torres, let's go back to October 18,
17  2002, your birthday.
18  A  Yes.
19  Q  You went to 1933 West Fourth Street, you
20  had a key to the apartment, and you let your dog in;
21  is that correct?
22  A  Yes.
23  Q  Okay.

Page 174

1       THE COURT: You have to speak up, ma'am.
2   I can't -- the jury can't hear you.
3   BY MR. FIGLIOLA:
4   Q  Yes?
5   A  Yes.
6   Q  And was Mr. Ortiz there? Yes or no.
7   A  No.
8   Q  He was not there? Okay.
9   A  He was supposed to meet me there.
10  Q  But he wasn't there because he was in
11  New York with his daughters; right?
12  A  Not at the time he was already here.
13  Q  But he had already come back?
14  A  Yes.
15  Q  And --
16  A  He told me -- I call him. He told me to
17  meet him at the apartment.
18  Q  But he didn't show up?
19  A  Yes. Then I put my dog in there. My mom
20  dropped me off on the corner. I came in the house.
21  Then he came in. I left my dog in there, went to my
22  mom's house. Then, I call him again later on, and he
23  picked me up.

Page 175

1   Q  When did he go see his daughters?
2   A  He left early in the morning.
3   Q  What time was it that he -- he got back
4   to West Fourth Street?
5   A  What is it?
6   Q  What time did you meet him at West Fourth
7   Street?
8   A  I don't know.
9       MR. FIGLIOLA: You don't know? Nothing
10  further.
11      THE COURT: Mr. Tease, anything?
12      MR. TEASE: Just briefly, your Honor.
13          RECROSS-EXAMINATION
14  BY MR. TEASE:
15  Q  Miss Ayala, are you having any trouble
16  remembering what happened on that day?
17  A  I just can't remember about times and
18  specific everything.
19  Q  So, are the things you're saying today,
20  are you absolutely sure about them, or are you --
21  A  Yes, that day, pled myself guilty. I
22  knew everything that was going on.
23  Q  I'm just asking, your testimony today,

Page 176

1   there's been some things that you're not too sure
2   about and all that. My question to you is, are you
3   certain about all this testimony, or are you just
4   giving it your best shot?
5   A  I'm trying my best.
6   Q  Trying your best. But you are foggy
7   about some of what happened?
8   A  I don't know.
9       MR. TEASE: Okay. Nothing further.
10  Thank you.
11      MS. KELSEY: I have nothing further for
12  this witness. May she be excused, your Honor?
13      THE COURT: I want to send the jury out
14  first.
15      Ladies and gentlemen, we are finished for
16  today, and I am going to excuse you until 10 A.M.
17  tomorrow. Then, we'll -- we should be able to
18  proceed.
19      Remember the admonitions I gave you.
20      (Jury leaves courtroom at 4:56 P.M.)
21      THE COURT: Ma'am, I'm going to excuse
22  you, but I want you to understand something.
23      THE WITNESS: Yes.

Page 177

1  THE COURT: I didn't appreciate the
2  attitude either time you testified. And I didn't
3  appreciate, what appeared to me at least, to be your
4  lack of candor. Fortunately, I don't decide issues
5  of fact in this case. I also want to let you know,
6  you came awfully close to not going home. And you're
7  over 16, so the WCI which is the adult women's prison
8  is where you would go. Fortunately, the State didn't
9  press, and neither did the defense attorney. I want
10  you to know this is an adult Court.
11  THE WITNESS: Yes.
12  THE COURT: It's not kindergarten, and
13  it's not a fun place, and I don't have to be nice. I
14  just have to get people to respect the Court.
15  Whatever attitude you have, you take it back on the
16  street from whence it came because it's not
17  appreciated here. I'm not the school system, I'm not
18  Family Court, so I don't have to put up with that
19  attitude. You better hope our paths never cross
20  again professionally, because it won't be a
21  particularly -- I'm talking to you and you look at me
22  when I'm talking to you. I'm not a kid and I'm not
23  your mom, or anybody else. I'm a judge of the

Page 178

1  Superior Court, and don't you ever forget that as
2  long as you live. None of us have to take that or
3  deal with it. And I think you better realize that
4  because, in the adult system, we do not tolerate
5  that.
6  Do you understand me, then?
7  THE WITNESS: Yes.
8  THE COURT: I'm here, and it's a sign of
9  disrespect when you don't look at somebody you're
10  talking to. And I can enforce respect to this Court
11  because I'll declare you a material witness in a
12  heartbeat. So, I suggest you, respectfully and
13  quietly, leave the courtroom and hope that nobody has
14  to call you back, because I'm not putting up with the
15  attitude a third time.
16  Do we understand each other?
17  THE WITNESS: Yes, sir.
18  THE COURT: You may leave.
19  (Witness excused.)
20  THE COURT: Now, Mr. Ortiz, the officers
21  are going to take that watch because it's not coming
22  back into the courtroom anymore. I don't know
23  whether you thought that was funny, didn't know how

Page 179

1  to shut it off, or what. But let me explain
2  something to you so we have this other thing
3  straight.
4  First of all, are you suffering from some
5  neck disability? Well, then, straighten up your head
6  when you talk to me. That's also a sign of
7  disrespect in my mind. So, I'm not in the mood
8  today, fellow, okay? Now, you better talk with
9  somebody else over at the Hill or talk to the
10  officers. But we're going to observe a certain sense
11  of decorum -- and I'm sure you know what decorum
12  means -- in this courtroom. Now, it may have been
13  mildly amusing to you to have your watch go off, but
14  I can take a watch because this is my courtroom, a
15  beeper or anything else. And one thing these fellows
16  in blue will do is whatever I order them to do, short
17  of hurting each other.
18  Now, if you wish to try me, not a problem
19  because I can order anything from full restraints to
20  exclusion from the courtroom to the stun belt, if I
21  deem it appropriate. And trust me, Mr. Ortiz, I'd do
22  it. And if you think I won't, all you have to do is
23  evidence some contempt, and we'll see. Now is your

Page 180

1  time if either you or Mr. Rivera or anybody else
2  wants to try me, because I'm in the right frame of
3  mind. So, now is the time for to you make the show
4  if you think you need to. And don't even look like
5  you're going to smirk.
6  MR. ORTIZ: Sorry, because I don't know
7  I'm not supposed to bring the watch in here.
8  THE COURT: Did you understand what I
9  said and what I meant?
10  MR. ORTIZ: Yes, yes, sir.
11  THE COURT: Sit down. Officer, I know
12  you got different notes of the times.
13  UNIDENTIFIED OFFICER: I apologize, sir.
14  THE COURT: But I don't like the
15  disruption.
16  UNIDENTIFIED OFFICER: Yes, sir.
17  THE COURT: All right. I'm going up to
18  see Judge Smalls now and we'll go forward tomorrow.
19  And I'll -- and even if I don't catch him, he's
20  usually there until 6:30 or 7:00. He lives real
21  close to me, right around the corner, so I can find
22  him if I need him. And it's -- what did you call it?
23  THE INTERPRETER: What is my name?

Page 181

1    THE COURT: What did you call what it is
2  you're supposed to?
3    THE INTERPRETER: Suspension and
4  insurance calendar.
5    THE COURT: Driving calendar.
6    THE INTERPRETER: Just to let you know,
7  your Honor, the judge always comes in at 10:00, and
8  if all the pleas are done, my pleas could be first
9  and I could be done by 10:15.
10    THE COURT: But you come here first.
11  I'll deal with Judge Smalls.
12    THE INTERPRETER: We begin at 8:30 you
13  said you begin at 10:00.
14    THE COURT: Make sure you're here at 10
15  so we can go forward. I'll go see Judge Smalls now
16  and I will find it out. But it shouldn't be a
17  problem. We'll work it out so that you don't -- if
18  we have to arrange it so that if there's some plea or
19  something, we can do it at a time certain. It's no
20  problem. We've always cooperated with each other.
21  And it's not an issue one way or the other. I mean,
22  it's an issue if we don't handle it, but it's not an
23  issue if I go up there and talk to him first.

Page 182

1    All right. Who do you have tomorrow?
2    MS. KELSEY: Your Honor, Detectives
3  Rodriguez and Drysdale and Emory and maybe --
4    THE COURT: And who?
5    MR. FIGLIOLA: Maybe.
6    MS. KELSEY: Emory.
7    THE COURT: Emory, okay.
8    MS. KELSEY: I said Detectives Rodriguez,
9  Drysdale, Emory, I'm going to do DiSabatino and
10  Mr. Bajwa from the Medical Examiner's Office.
11    THE COURT: I don't think it makes any
12  difference to defense attorneys, but Emory I know
13  since he was a kid, when he was a baby. I know his
14  parents real well and his aunt. We're all from the
15  same church. It's not a suppression hearing, so I
16  don't see whether it matters one way or the other.
17  It's just a kid I watched grow up.
18    MR. FIGLIOLA: It's not a problem,
19  your Honor.
20    MR. TEASE: Not here.
21    THE COURT: Okay. I'm sure it's not from
22  the State's perspective, for the same reason.
23    MS. KELSEY: No. And just for the

Page 183

1  record, he did surveillance before they executed the
2  search warrant, but he didn't find any drugs or
3  interview anybody or do anything like that.
4    THE COURT: It's not, since it's not a
5  suppression it's not a credibility issue, but it's a
6  lot easier because we're so small, maybe just
7  disclose it and it doesn't matter.
8    MS. KELSEY: Actually, I think I already
9  knew that.
10    THE COURT: Because we had another case
11  where he was surveillance on West Street or East
12  Street, something like that.
13    MS. KELSEY: Your Honor, you're way
14  beyond my ability to remember the specifics of any
15  case.
16    THE COURT: I remember the case because
17  the guy said he was walking down the street when they
18  snatched him up, which was interesting.
19    But, anyway, all right, we stand in
20  recess.
21    (Trial recessed for the day.)
22
23

Page 184

1  STATE OF DELAWARE:
2          SS:
3  NEW CASTLE COUNTY:
4    I, Lynne Bell Coale, Registered Merit
5  Reporter and Official Court Reporter of the Superior
6  Court, State of Delaware, do hereby certify that the
7  foregoing is an accurate transcript of the testimony
8  adduced and proceedings had, as reported by me in the
9  Superior Court of the State of Delaware, in and for
10  New Castle County, in the case therein stated, as the
11  same remains of record in the Office of the
12  Prothonotary at Wilmington, Delaware, and that I am
13  neither of counsel nor kin to any party or
14  participant in said action nor interested in the
15  outcome thereof.
16    WITNESS my hand this 1st day of March,
17  2004.
18
19    Lynne Bell Coale, RMR
      (Cert No. 165-PS)
20    Official Court Reporter
21
22
23

# Certificate of Service

I,___ISAIAS R. ORTIZ_____,hereby certify that I have served a true

And correct cop(ies) of the attached:___PETITION FOR WRIT OF HABEAS___

CORPUS W/ ATTACHMENTS_____ upon the following

parties/person (s):

TO: _Delaware Attorney General__     TO: _____

___Dept. of Justice_____     _____

___820 N. French St._____     _____

___Wilmington, DE_____     _____

_____19802_____     _____


TO:_____     TO:_____

_____     _____

_____     _____

_____     _____

_____     _____


BY PLACING SAME IN A SEALED ENVELOPE, and depositing same in the United
States Mail at the Delaware Correctional Center, Smyrna, DE 19977.


On this__26th__day of_____June_____,200_7_

_____Isaias R. Ortiz_____

INM. Isaias R. Ortiz
SBI#: 480274 UNIT: S-1
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977



$0.00



Del. District Court
844 N. King St.
Lockbox 18
Wilmington, DE
19801

U.S.M.S.
X-RAY

PRIORITY MAIL
UNITED STATES POSTAL SERVICE
WWW.USPS.COM
Label 107R, February 2006

